## BRYANT ET AL. *v.* YELLEN ET AL.

No. 79-421.   Argued March 25, 1980—Decided June 16, 1980*

---

*Together with No. 79-425, *California et al.* v. *Yellen et al.*, and No. 79-435, *Imperial Irrigation District et al.* v. *Yellen et al.*, also on certiorari to the same court.

WHITE, J., delivered the opinion for a unanimous Court.

*Northcutt Ely* and *Charles W. Bender* argued the cause for petitioners in all cases. With Mr. Ely on the briefs for petitioner Imperial Irrigation District in No. 79–435 were *Reginald L. Knox, Jr., Frederick H. Ritts, Robert F. Pietrowski, Jr., Ralph J. Gillis,* and *Charles E. Corker.* With Mr. Bender on the briefs for petitioners Bryant et al. in No. 79–421 were *Patrick Lynch, James V. Selna,* and *John F. Daum. George Deukmejian,* Attorney General, *R. H. Connett,* Assistant Attorney General, and *Douglas B. Noble,* Deputy Attorney General, filed a brief for the State of California, petitioner in all cases.

*Arthur Brunwasser* argued the cause and filed a brief for

respondents in all cases. *Solicitor General McCree* argued the cause for the United States in all cases. With him on the brief were *Assistant Attorney General Moorman, Deputy Solicitor General Claiborne, Mark I. Levy, Peter R. Steenland, Jr., Raymond N. Zagone,* and *Dirk D. Snel.*†

MR. JUSTICE WHITE delivered the opinion of the Court.

When the Boulder Canyon Project Act, 45 Stat. 1057, 43 U. S. C. § 617 *et seq.* (Project Act), became effective in 1929, a large area in Imperial Valley, Cal., was already being irrigated by Colorado River water brought to the Valley by a privately owned delivery and distribution system. Pursuant to the Project Act, the United States constructed and the Imperial Irrigation District (District) agreed to pay for a new diversion dam and a new canal connecting the dam with the District. The Project Act was supplemental to the reclamation laws, which as a general rule limited water deliveries from reclamation projects to 160 acres under single ownership. The Project Act, however, required that the Secretary of the Interior (Secretary) observe rights to Colorado River water that had been perfected under state law at the time the Act became effective. In the course of contracting with the District for the building of the new dam and canal and for the delivery of water to the District, the United States represented that the Project Act did not impose acreage limitations on lands that already had vested or present rights to Colorado River water. The United States officially adhered to that position until 1964 when it repudiated its prior construction of the Project Act and sued the District, claiming that the 160-acre limitation contained in the reclamation law applies to all privately owned lands in the District, whether or not they had been irrigated in 1929. The District Court found for the District and its landowners, 322 F. Supp. 11 (SD Cal.

---

†*Robert Marvin Teets, Jr., Christopher E. Hamilton, Ralph Santiago Abascal, Ellen Josephson,* and *Sidney M. Wolinsky* filed a brief for Pedro Duarte et al. as *amici curiae* urging affirmance in all cases.

1971), but the Court of Appeals reversed and sustained the Government's position, 559 F. 2d 509 (CA9 1977). We now reverse the Court of Appeals with respect to those lands that were irrigated in 1929 and with respect to which the District has been adjudicated to have a perfected water right as of that date, a water right which, until 1964, the United States Department of the Interior officially represented foreclosed the application of acreage limitations. The judgment is otherwise vacated.

## I

Imperial Valley is an area located south of the Salton Sea in southeastern California. It lies below sea level, and is an arid desert in its natural state. In 1901, however, irrigation began in the Valley, using water diverted from the Colorado River, which in that area marks the border between California and Arizona. Until at least 1940, irrigation water was brought to the Valley by means of a canal and distribution system that were completely privately financed. On June 25, 1929, when the Project Act became effective, the District [1] was diverting, transporting, and delivering water to 424,145 acres of privately owned and very productive farmland in Imperial Valley. [2] Under neither state law nor private irrigation arrangements in existence in Imperial Valley prior to 1929 was there any restriction on the number of acres that a single landholder could own and irrigate.

Prior to 1929 and for several years thereafter, the water diverted from the Colorado River was carried to the Valley through the Alamo Canal, which left the river north of the

---

[1] Under California law, an irrigation district is a public corporation governed by a board of directors, usually elected by voters in the district. It is empowered to distribute and otherwise administer water for the beneficial use of its inhabitants and to levy assessments upon the lands served for the payment of its expenses.

[2] The parties stipulated that the value of agricultural products in the Valley, overall, increased from some $4 million in 1909 to approximately $200 million in 1965.

border with Mexico but then traversed Mexican territory for some 50 miles before turning northward into Imperial Valley. This distribution system, entirely privately financed and owned, comprised approximately 1,700 miles of main and lateral canals, all serving to divert and deliver the necessary waters to the lands in Imperial Valley.

The Project Act was the culmination of the efforts of the seven States in the Colorado River Basin to control flooding, regulate water supplies on a predictable basis, allocate waters among the Upper and Lower Basin States and among the States in each basin, and connect the river to the Imperial Valley by a canal that did not pass through Mexico.[3] In 1922, the seven States executed the Colorado River Compact (Compact) allocating the waters of the river between the Upper and Lower Basins, and among other things providing in Art. VIII that "[p]resent perfected rights to the beneficial use of waters of the Colorado River System are unimpaired by this compact."[4] The Project Act, passed in

---

[3] The Colorado River was subject to flooding. In 1905, the river broke through its banks and flooded the Alamo Canal and Imperial Valley. The California Development Co., then the major force in Imperial Valley, sought financial assistance from the Southern Pacific Co. whose tracks were threatened by the floodwaters. The railroad, taking as security a controlling interest in the California Development Co., returned the river to its channel and ultimately foreclosed on its security, transferring these interests to the District. The District acquired certain mutual water companies in 1922–1923 and has been solely responsible since that time for the diversion, transportation, and distribution of water from the Colorado River to the Imperial Valley.

Difficulties also arose because the Alamo Canal passed through Mexican territory and hence was partly subject to Mexican sovereignty. As a Senate Committee remarked, a new canal would "end an intolerable situation, under which the Imperial Valley now secures its sole water supply from a canal running for many miles through Mexico. . . ." S. Rep. No. 592, 70th Cong., 1st Sess., 8 (1928).

[4] The provision apparently resulted from the concern of the farmers of Imperial Valley that after two decades of productive reliance on the

1928 and effective in 1929, implemented and ratified the Compact; contained its own formula for allocating Lower Basin water among California, Arizona, and Nevada, *Arizona* v. *California*, 373 U. S. 546 (1963); and authorized the construction of the works required for the harnessing and more efficient utilization of the unruly river. The principal works of the Project, consisting of the Hoover Dam at Black Canyon and the storage facilities behind it, served to implement the division of the Compact. The dam was completed and storage began in 1935.[5]

Section 1 of the Project Act, which provided for the dam at Black Canyon, also authorized the construction of a new canal, the All-American Canal, which would replace the Alamo Canal and would traverse only territory located in the United States. A new diversion dam for Imperial Valley water was also authorized. Section 1 went on to provide that no charge should be made for the storage or delivery of irrigation or potable water to Imperial or Coachella Valley.[6]

---

Alamo Canal Project, their existing water rights might be impaired by the Compact allocation. Delph Carpenter, one of the draftsmen of the Compact, testified in hearings on a precursor of the Project Act as follows:

"During the deliberations of the Colorado River Commission at Santa Fe, and after 10 days' work, a sketch or outline of the progress was released to the press, stating what had happened and the proposed terms of a treaty. . . . The Imperial Valley representatives were immediately responsive. They came before the Commission and presented their claims with great vigor. . . .

"In view of that claim, coming as it did from people who cultivated upward of half a million acres of very valuable land, . . . Article VIII of the compact was drawn at the last session of the proceedings." Hearings Pursuant to S. Res. 320 before the Senate Committee on Irrigation and Reclamation, 68th Cong., 2d Sess., pt. 1, p. 678 (1925).

[5] The genesis of the Project Act and of the Colorado River Compact is described at greater length in *Arizona* v. *California*, 373 U. S. 546, 552–562 (1963).

[6] Coachella Valley is an area lying north of Imperial Valley across the Salton Sea. Unlike Imperial Valley, it was not being irrigated with

Section 4 (a) of the Project Act conditioned the effectiveness of the Act on the ratification of the Compact by the signatory States.[7] Section 4 (b), as well as requiring contractual provision for the repayment of specified costs with respect to the Hoover Dam, required that before any money was appropriated for the Imperial Valley works, the Secretary was to make provision for revenues "by contract or otherwise" to insure payment of all "expenses of construction, operation, and maintenance of said main canal and appurtenant structures in the manner provided in the reclamation law." Section 5 authorized the Secretary to contract for the storage of water and for its delivery at such points on the river and the canal as were agreed upon. Contracts were to be for permanent service and were required before any person would be entitled to stored water.

Section 6 of the Project Act, of critical importance in these cases, mandated that the works authorized by § 1 were to be used: "First, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses and satisfaction of present perfected rights in pursuance of Article VIII of said Colorado River compact; and third, for power." Section 9 authorized the opening to entry of the public lands that would become irrigable by the Project but in tracts not greater than 160 acres in size in accordance with the provisions of the reclamation law.

Section 14 provided that the Project Act should be deemed supplemental to the reclamation law, "which said reclamation law shall govern the construction, operation, and management

Colorado River water in 1929. Coachella Valley is not involved in these cases.

[7] Section 4 (a) also contained provisions which, together with the Secretary's power under § 5 to contract for storage and delivery of water with particular water users and with § 8's tying the Project Act and the Compact together, provided the basis for the Court's holding in *Arizona* v. *California* that the Project Act itself sufficiently revealed the intent of Congress with respect to the division of the project water among the Lower Basin States.

of the works herein authorized, except as otherwise herein provided." The "reclamation law" referred to was defined in § 12 as the Act of June 17, 1902 (Reclamation Act), 32 Stat. 388, and Acts amendatory thereof and supplemental thereto. One of the statutes amendatory of or supplemental to the Reclamation Act was the Omnibus Adjustment Act of 1926 (1926 Act), § 46 of which, 44 Stat. (part 2) 649, 43 U. S. C. § 423e, forbade delivery of reclamation project water to any irrigable land held in private ownership by one owner in excess of 160 acres,[8] and required owners to execute recordable contracts for the sale of excess lands before such lands could receive project water.

Pursuant to the Project Act, the United States and the District entered into a contract on December 1, 1932, providing for the construction of the Imperial Dam and the All-American Canal. The District undertook to pay the cost of the works, and to include within itself certain public lands of the United States and other specified lands.[9] The United States undertook to deliver to the Imperial Dam the water which would be carried by the new canal to the various lands to be served by it. The contract contained no acreage limitation provision. Pursuant to this contract, the United States constructed the Imperial Dam in the Colorado River—some

---

[8] Section 46 provides in relevant part:

"No water shall be delivered upon the completion of any new project or new division of a project until a contract or contracts in form approved by the Secretary of the Interior shall have been made with an irrigation district or irrigation districts organized under State law providing for payment by the district or districts of the cost of constructing, operating, and maintaining the works during the time they are in control of the United States, such cost of constructing to be repaid within such terms of years as the Secretary may find to be necessary, in any event not more than forty years from the date of public notice hereinafter referred to, and the execution of said contract or contracts shall have been confirmed by a decree of a court of competent jurisdiction."

[9] In 1942, pursuant to this provision, the District expanded its boundaries to include 271,588 acres of the unpatented public lands.

distance below Black Canyon but upriver from the existing point of diversion—and the All-American Canal connecting the dam and Imperial Valley. Use of the canal began in 1940, and by 1942 it carried all Colorado River water used by Imperial Valley.[10]

Article 31 of the contract between the District and the United States provided that the United States would not be bound by the contract until and unless court proceedings had been instituted by the District and a final judgment obtained confirming the authorization and the validity of the contract.[11] Such an action, entitled *Hewes* v. *All Persons,* No. 15460, Superior Court, Imperial County, was instituted and final

[10] The All-American Canal system was not declared completed until 1952. By that time, pursuant to the 1932 contract, the care, operation, and maintenance of the system, with specified exceptions, had been transferred to the District, although title to the Imperial Dam and the canal remained in the United States. Repayment of construction charges commenced on March 1, 1955. The District's financial obligation was determined to be approximately $25 million, repayable in 40 annual installments, without interest. All payments to date have been made from net power revenues derived from the sale of electrical energy generated by hydroelectrical facilities of the All-American Canal, facilities which cost the District approximately $15 million.

[11] The Act of May 15, 1922, ch. 190, § 1, 42 Stat. 541, 43 U. S. C. § 511, authorized the Secretary to contract with irrigation districts but provided that no contract under the section "shall be binding on the United States until the proceedings on the part of the district for the authorization of the execution of the contract with the United States shall have been confirmed by decree of a court of competent jurisdiction, or pending appellate action if ground for appeal be laid." The 1926 Act also required that the "execution" of the contracts referred to in the section be judicially confirmed.

In addition, the law of California specified preconditions to the effectiveness of water district contracts. Approval by the governing body was required as well as by district members voting in an election for that purpose. A district was also permitted to submit the contract to Superior Court for validation proceedings. The decree in *Hewes* v. *All Persons,* discussed in the text, concluded that California law had been satisfied in all respects.

judgment was entered on July 1, 1933, confirming the validity of the contract in all respects. App. to Pet. for Cert. in No. 79–435, pp. 120a–154a. In connection with these proceedings, the then Secretary, Ray Lyman Wilbur, on February 24, 1933, submitted a letter to the District dealing with the question whether the 160-acre limitation of the reclamation law was applicable in Imperial Valley. Among other things, the letter stated:

> "Upon careful consideration the view was reached that this limitation does not apply to lands now cultivated and having a present water right. These lands, having already a water right, are entitled to have such vested right recognized without regard to the acreage limitation mentioned. Congress evidently recognized that these lands had a vested right when the provision was inserted that no charge shall be made for the storage, use, or delivery of water to be furnished these areas." [12]

The trial court in the *Hewes* case expressly found and concluded that eligibility for project water was not limited to 160-acre tracts in single ownership.[13] An appeal in the case was dismissed before judgment. The United States was not a party to the action.

---

[12] App. 177a, 71 I. D. 496, 530 (1964). Secretary Wilbur's letter referred specifically only to the applicability of § 5 of the Reclamation Act to the privately owned district lands. Five days later, the Assistant Commissioner and Chief Counsel of the Bureau of Reclamation, Porter W. Dent, issued a letter confirming that the Department's interpretation likewise applied to § 46 of the 1926 Act. App. 179a, 71 I. D., at 531.

[13] Finding of Fact No. 35 in pertinent part said that under the 1932 contract, "the delivery of water will not be limited to 160 acres in a single ownership . . . and that water service to lands regardless of the size of ownership will not be in any manner affected by said contract, so far as the size of individual ownership is concerned." App. to Pet. for Cert. in No. 79–435, p. 144a. Conclusion of Law No. XI stated that "neither the United States nor Imperial Irrigation District is limited by the terms of said contract or by any law applicable thereto in the delivery of water to any maximum acreage of land held in a single ownership." *Id.*, at 149a.

The Wilbur letter expressing the view that lands under irrigation at the time the Project Act was passed and having a present water right were not subject to the 160-acre limitation remained the official view of the Department of the Interior until 1964 [14] when the Department adopted the view

---

[14] As the District Court pointed out, there was no suggestion by anyone during the construction of the All-American Canal that acreage limitations would be applicable to lands under cultivation in 1929. And based on its own "thorough review of Departmental policy," the District Court also concluded that the Wilbur interpretation of the Project Act remained the official view of the United States "during the incumbencies of six successor Secretaries and four Presidential administrations." 322 F. Supp. 11, 26 (SD Cal. 1971).

In 1942, in response to inquiry from the Federal Land Bank as to the applicability of the 160-acre limitation in Imperial Valley, the Commissioner of the Bureau of Reclamation replied in the negative. In 1944, Assistant Commissioner of Reclamation Warne testified before a Senate Subcommittee that "the limitation was never applied under the law to the Imperial Valley, except as a matter of new lands . . . ," and went on to make the Wilbur letter part of the Subcommittee's record. Hearings on H. R. 3961 before a Subcommittee of the Senate Committee on Commerce, 78th Cong., 2d Sess., pt. 4, pp. 599, 764–765 (1944).

In 1945, the Solicitor of the Interior Department ruled that the 160-acre limitation was applicable to Coachella Valley. 71 I. D., at 533. In the course of the opinion, he also disagreed with the Wilbur letter with respect to Imperial Valley, but did not purport to overrule it. In 1948, Secretary Krug, in response to an inquiry from a veterans' organization, issued a letter affirming the Department's adherence to the Wilbur ruling. App. 253a–254a.

In 1952, after several years of negotiations, changes were effected in the 1932 contract between the District and the United States, but the Department did not insist that an acreage limitation be included or that the Wilbur position be abandoned.

In response to inquiry from the Solicitor General in 1958, the then Solicitor of the Department of the Interior reaffirmed the Department's position with respect to the Wilbur letter. *Id.*, at 255a–260a. The Solicitor General, however, without the concurrence of the Department, answered the inquiry of the Special Master in *Arizona v. California,* suggesting that the question of acreage limitations was irrelevant to the proceedings before the Master but also indicating in a footnote his disagree-

of its then Solicitor that the limitation should have applied to all Imperial Valley lands in private ownership.

Meanwhile, it having become apparent that neither the Compact nor the Project Act settled to the satisfaction of the Lower Basin States how the water allocated to them should be divided, an original action was begun in this Court in 1952 to settle this fundamental question and related issues, including the ascertainment of present perfected rights the unimpaired preservation of which was required by both the Compact and the Project Act. After more than 10 years of litigation, the opinion in *Arizona* v. *California* was handed down on June 3, 1963. 373 U. S. 546. Although the dispute among the Lower Basin States was at the heart of the controversy, for present purposes the primary aspect of the case was the recognition given to present perfected rights in the opinion and the ensuing decrees.

The opinion recognized that under § 14 of the Project Act, the construction, operation, and management of the works were to be subject to the provisions of the reclamation law, except as the Act otherwise provided, and that one of the most significant limitations in the Project Act on the Secretary's authority to contract for the delivery of water is the requirement to satisfy present perfected rights, "a matter of intense importance to those who had reduced their water rights to actual beneficial use at the time the Act became effective." 373 U. S., at 584. The decree, which was entered on March 9, 1964, 376 U. S. 340, defined a perfected right as:

"[A] water right acquired in accordance with state law, which right has been exercised by the actual diversion of a specific quantity of water that has been applied to a

ment with the Wilbur letter and the Department's position. App. 260a–263a. Also in 1958, the Solicitor General expressed the same opinion in the *Ivanhoe* litigation. Brief for United States as *Amicus Curiae* in *Ivanhoe Irrig. Dist.* v. *McCracken,* O. T. 1957, Nos. 122 *et al.,* p. 37, n. 9. It was not until 1964 that the Secretary repudiated the Department's prior position. 71 I. D. 496.

defined area of land or to definite municipal or industrial works. . . ." *Id.*, at 341.

Present perfected rights were defined as those perfected rights "existing as of June 25, 1929, the effective date of the Boulder Canyon Project Act." *Ibid.* The decree also provided for the future determination of the specific present perfected rights in each of the Lower Basin States. A supplemental decree was eventually forthcoming, 439 U. S. 419 (1979), and in that decree the Imperial Irrigation District was adjudged to have a present perfected right

"in annual quantities not to exceed (i) 2,600,000 acre-feet of diversions from the mainstream or (ii) the quantity of mainstream water necessary to supply the consumptive use required for irrigation of 424,145 acres and for the satisfaction of related uses, whichever of (i) or (ii) is less, with a priority date of 1901." *Id.*, at 429.

As already indicated, the Department of the Interior repudiated the Wilbur interpretation of the Project Act in 1964. It then sought to include its revised position in a renegotiated contract with the District. When the District refused to accept the Department's position, the United States sued the District in 1967 for a declaratory judgment that the excess-acreage limitation of § 46 applied to all private lands in the Valley. The District Court permitted several Imperial Valley landowners to intervene as defendants representing the certified class of all landowners owning more than 160 acres.[15] It then ruled against the Government, holding for several reasons that "the land limitation provisions of reclamation law have no application to privately owned lands lying within the Imperial Irrigation District" and that the District is not bound to observe such limitations. 322 F. Supp., at 27. The Department of the Interior recommended and the Solicitor

---

[15] The District Court found that there were some 800 owners in the District owning in the aggregate approximately 233,000 acres of excess land. 322 F. Supp., at 12.

General decided, after reviewing the case, that an appeal not be prosecuted on behalf of the United States.[16]  In consequence, respondents, a group of Imperial Valley residents, who had been given leave to participate as *amici* in the District Court and who desired to purchase the excess lands that might become available if § 46 were held applicable, attempted to intervene for purpose of appeal, but the District Court denied the motion.  The Court of Appeals reversed the denial, 559 F. 2d, at 543–544, and proceeded to hold that the appealing intervenors had standing under Art. III of the Constitution; that *Hewes* v. *All Persons* was not conclusive with respect to acreage limitation; that the clear import of § 46 and the Project Act was that the 160-acre limitation is applicable to the Imperial Valley; and that the Department's administrative practice over the years did not bar application of the limitation to the Valley.

Because of the importance of these cases, we granted the petitions for writs of certiorari filed by the District, the landowners, and the State of California.  444 U. S. 978 (1979).

## II

As a preliminary matter, we agree with the Court of Appeals that the respondents who sought to enter the suit when the United States forwent an appeal from the District Court's adverse decision had standing to intervene and press the appeal on their own behalf.  Respondents, most of whom are farmworkers, reside in Imperial Valley.  The essence of their claim was that they desired to purchase farmlands in Im-

---

[16] As indicated in a memorandum for the file prepared by the Solicitor General, the essence of the case for him was that an official construction of the Project Act had been made by the Department and followed for 38 years.  To overturn such a longstanding administrative decision did "not strike [the Solicitor General] as good administration, or good government."  126 Cong. Rec. 3281 (1980).  He concluded that an appeal to the Court of Appeals should not be taken because it would not, and, in his view, should not be successful.  His second reason was prophetic.

perial Valley and that if § 46 were applied as they believed it should be, there would be excess lands available for purchase at prices below the market value for irrigated land.[17] The Court of Appeals, although recognizing that no owner of excess lands would be required to sell, concluded that it would be highly improbable that all owners of excess lands would prefer to withdraw their irrigable lands from agriculture in order to avoid § 46. In these circumstances, the Court of Appeals ruled that under *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252 (1977), and other cases, respondents had standing even though they could not with certainty establish that they would be able to purchase excess lands if § 46 were held applicable.[18]

---

[17] Excess land offered for sale pursuant to § 46 must be sold at a price fixed by the Secretary of the Interior "on the basis of its actual bona fide value at the date of appraisal without reference to the proposed construction of the irrigation works. . . ." The Secretary may "cancel the water right attaching to the land" if it is sold for a different price. Because the federal reclamation project has added substantially to the value of land in the District, excess lands would be sold at prices far below their current fair market values. Since purchasers of such land would stand to reap significant gains on resale, the absence of detailed information about respondents' financial resources does not defeat respondents' claim of standing. Even if improvements to the land, such as installation of drainage systems, have enhanced its value, the potential windfall would remain and petitioners would possess a further incentive for offering excess lands for sale—to recoup the value of improvements—rather than withdrawing them from agricultural uses.

While the prospect of windfall profits could attract a large number of potential purchasers of the excess lands, respondents' interest is not "shared in substantially equal measure by all or a large class of citizens," *Warth* v. *Seldin*, 422 U. S. 490, 499 (1975), because respondents are residents of the Imperial Valley who desire to purchase the excess land for purposes of farming.

[18] In a subsequent opinion denying rehearing, the Court of Appeals reaffirmed that respondents had standing. 595 F. 2d 525 (1979). The court rejected the argument that because the District had repaid more than one-half of the construction costs of the irrigation project the Secretary no longer had the authority to fix sale prices for excess land. Section

This was a proper application of our cases. It being unlikely that any of the 800 owners of excess lands would sell land at below current market prices absent the applicability of § 46 and it being likely that excess lands would become available at less than market prices if § 46 were applied, the Court of Appeals properly concluded that respondents had a sufficient stake in the outcome of the controversy to afford them standing to appeal the District Court's decision.

## III

We are unable, however, to agree with the Court of Appeals that Congress intended that the 160-acre limitation of the 1926 Act would apply to the lands under irrigation in Imperial Valley in 1929.[19]  Under § 14 of the Project Act, the construction, operation, and management of the project works were to be governed by the reclamation law, but only if not otherwise provided for in the Project Act. Section 46 of the 1926 Act is one of the reclamation laws; and its acreage limita-

46 provides in pertinent part that "until one-half the construction charges against said lands shall have been fully paid no sale of any such lands shall carry the right to receive water unless and until the purchase price involved in such sale is approved by the Secretary of the Interior. . . ." The Court of Appeals concluded that this portion of § 46 did not apply with respect to the initial breakup of excess lands for which the Secretary must fix the sale price "on the basis of its actual bona fide value at the date of appraisal without reference to the proposed construction of the irrigation works."

[19] Ever since its enactment in 1902, the reclamation law has generally limited to 160 acres the amount of private land in single ownership eligible to receive water from a reclamation project. This limitation helps open project lands to settlement by farmers of modest means, insures wide distribution of the benefits of federal projects, and guards against the possibility that speculators will earn windfall profits from the increase in value of their lands resulting from the federal project. See also *Ivanhoe Irrig. Dist.* v. *McCracken,* 357 U. S. 275, 292 (1958). The excess-acreage limitation has been retained in successive statutes culminating in § 46 of the 1926 Act.

tion, which expressly applies to contracts for "constructing, operating, and maintaining" project works, would appear to govern the delivery of project water unless its applicability is foreclosed by some other provision of the Project Act. The Court of Appeals, erroneously we think, found no such preclusion in § 6 of the Act.

Concededly, nothing in § 14, in § 46, or in the reclamation law in general would excuse the Secretary from recognizing his obligation to satisfy present perfected rights in Imperial Valley that were provided for by Art. VIII of the Compact and § 6 of the Project Act and adjudicated by this Court in *Arizona* v. *California,* 373 U. S. 546 (1963). The Court of Appeals neverthless held that § 46 could be applied consistently with § 6 because the perfected rights in Imperial Valley were owned by and would be adjudicated to the District, not to individual landowners, who were merely members of a class for whose benefit the water rights had been acquired and held in trust. Individual farmers, the Court of Appeals said, had no right under the law to a particular proportion of the District's water. Applying § 46 and denying water to excess lands not sold would merely require reallocation of the water among those eligible to receive it and would not reduce the water which the District was entitled to have delivered in accordance with its perfected rights.

We find this disposition of the § 6 defense to the application of the 1926 Act's acreage limitation to be unpersuasive. *Arizona* v. *California, supra,* at 584, recognized that "one of the most significant limitations" on the Secretary's power under the Project Act was the requirement that he satisfy present perfected rights, a matter of great significance to those who had reduced their water rights to beneficial use prior to 1929. Accordingly, in our initial decree, the perfected right protected by § 6 was defined with some care: a right that had been acquired in accordance with state law and that had been exercised by the actual diversion of a specific quantity of water

and its application to a defined area of land.[20]  In our supplemental decree, entered prior to the opinion of the Court of Appeals denying rehearing and rehearing en banc, there was decreed to the District a present perfected water right of 2.6 million acre-feet of diversions from the mainstream or the quantity of water necessary to supply the consumptive use required to irrigate 424,145 acres and related uses, whichever was less, with a priority date of 1901.  439 U. S., at 429.  We thus determined that, as of 1929, the District had perfected its rights under state law to divert the specified amount of water and had actually diverted that water to irrigate the defined quantity and area of land.  As we see it, the Court of Appeals failed to take adequate account of § 6 of the Project Act and its implementation in our opinion and decrees filed in the *Arizona* v. *California* litigation.

In the first place, it bears emphasizing that the § 6 perfected right is a water right originating under state law.  In *Arizona* v. *California,* we held that the Project Act vested in the Secretary the power to contract for project water deliveries independent of the direction of § 8 of the Reclamation Act to proceed in accordance with state law and of the admonition of § 18 of the Project Act not to interfere with state law.  373 U. S., at 586–588.[21]  We nevertheless clearly recognized that § 6 of the Project Act, requiring satisfaction of present perfected rights, was an unavoidable limitation on the Secretary's power and that in providing for these rights the Secretary

---

[20] This was the Special Master's recommended definition.  We accepted it over the objection of California.  In requiring actual diversion of water and its application to a defined area of land, the definition did not reach all appropriative water rights under state law.  See Report of Special Master, *Arizona* v. *California,* O. T. 1960, No. 8 Orig., pp. 307–309 (hereinafter Special Master Report).

[21] In terms of reclamation law generally, the import of the Court's opinion in this respect was considerably narrowed in *California* v. *United States,* 438 U. S. 645 (1978), but the latter case did not question the description of the Secretary's power under the Project Act itself.

must take account of state law. In this respect, state law was not displaced by the Project Act and must be consulted in determining the content and characteristics of the water right that was adjudicated to the District by our decree.[22]

It may be true, as the Court of Appeals said, that no individual farm in the District has a permanent right to any specific proportion of the water held in trust by the District. But there is no doubt that prior to 1929 the District, in exercising its rights as trustee, delivered water to individual farmer beneficiaries without regard to the amount of land under single ownership. It has been doing so ever since. There is no suggestion, by the Court of Appeals or otherwise, that as a matter of state law and absent the interposition of some federal duty, the District did not have the right and privilege to exercise and use its water right in this manner. Nor has it been suggested that the District, absent some duty or disability imposed by federal law, could have rightfully denied water to individual farmers owning more than 160 acres. Indeed, as a matter of state law, not only did the District's water right entitle it to deliver water to the farms in the District regardless of size, but also the right was equitably owned by the beneficiaries to whom the District was obligated to deliver water.[23]

---

[22] While the source of present perfected rights is to be found in state law, the question of whether rights provided by state law amount to present perfected rights within the meaning of § 6 is obviously one of federal law. See *Ivanhoe Irrig. Dist.* v. *McCracken, supra*, at 289; *California* v. *United States, supra*, at 668–669, n. 21, 671–673, 678, n. 31.

[23] *Ivanhoe Irrig. Dist.* v. *All Parties and Persons*, 47 Cal. 2d 597, 624–625, 306 P. 2d 824, 840 (1957), rev'd *sub nom. Ivanhoe Irrig. Dist.* v. *McCracken*, 357 U. S. 275 (1958). As beneficiaries of the trust, the landowners have a legally enforceable right, appurtenant to their lands, to continued service by the District. *Erwin* v. *Gage Canal Co.*, 226 Cal. App. 2d 189, 194–195, 37 Cal. Rptr. 901, 903–904 (1964); *South Pasadena* v. *Pasadena Land & Water Co.*, 152 Cal. 579, 588, 93 P. 490, 494 (1908). The District is obligated not only to continue delivery, but also to apportion water distributed for irrigation purposes ratably to each landowner in

These were important characteristics of the District's water right as of the effective date of the Project Act, and the question is whether Congress intended to effect serious changes in the nature of the water right by doing away with the District's privilege and duty to service farms regardless of their size. We are quite sure that Congress did not so intend and that to hold otherwise is to misunderstand the Project Act and the substantive meaning of "present perfected rights" as defined by this Court's decree.

The Court of Appeals said it would not be a breach of trust by a water district to obey the dictates of § 46, relying on *Ivanhoe Irrig. Dist.* v. *All Parties and Persons*, 53 Cal. 2d 692, 712, 350 P. 2d 69, 81 (1960). But the issue here is whether § 46 applies to lands already being irrigated in 1929. In the *Ivanhoe* proceedings, the courts were not dealing with perfected rights to water that the project there involved would furnish, nor with a Project Act that specifically required present perfected rights to be satisfied. Here, we are dealing with perfected rights protected by the Project Act; and because its water rights are to be interpreted in the light of state law, the District should now be as free of land limitations with respect to the land it was irrigating in 1929 as it was

---

accordance with his share of the total assessments in the District. Cal. Water Code Ann. § 22250 (West 1956).

In the *Ivanhoe* litigation, the California Supreme Court originally determined that to deny water to farms in excess of 160 acres in single ownership would contravene § 22250, and would work a denial of due process and equal protection of the laws. Following this Court's decision that the 160-acre limitations contained in irrigation contracts for the Central Valley Project were mandated by federal reclamation law, the California Supreme Court, on remand, held that in light of this Court's opinion, water could be denied to farms exceeding the acreage limitation without violating state law. *Ivanhoe Irrig. Dist.* v. *All Parties and Persons*, 53 Cal. 2d 692, 350 P. 2d 69 (1960). However, the court's decision made clear that absent an overriding provision of federal law imposing an acreage limitation, state law debars an irrigation district from denying water to farms on the basis of size.

prior to the passage of the Project Act. To apply § 46 would go far toward emasculating the substance, under state law, of the water right decreed to the District, as well as substantially limiting its duties to, and the rights of, the farmer-beneficiaries in the District.[24]

It should also be recalled that we defined a present perfected right as one that had not only been acquired pursuant to state law but as one that had also been exercised by the diversion of water and its actual application to a specific area of land. We did not intend to decree a water right to the District under this definition, conditioned upon proof of actual diversion and use, but nevertheless to require the District to terminate service to the lands on the basis of which the right was decreed. The District has itself no power to require that excess lands be sold, and it is a contradiction in terms to say, as the Court of Appeals did, that the District has present perfected rights but that § 46 requires it to terminate deliveries to all persons with excess lands who refuse to sell.[25] We consequently hold that the perfected water right decreed to the District may be exercised by it without regard to the

---

[24] In *Ivanhoe Irrig. Dist.* v. *McCracken, supra,* at 292, the Court remarked that where a particular project has been exempted from the acreage limitation because of its peculiar circumstances, "the Congress has always made such exemption by express enactment." As we have explained, we have little trouble in concluding that the Project Act's provision for the satisfaction of perfected rights acquired under state law is an effective expression that the acreage limitation would be inapplicable to the lands served under such rights. As the Special Master observed in *Arizona* v. *California,* "the congressional intention was to insure that persons actually applying water to beneficial use would not have their uses disturbed by the erection of the dam and the storage of water in the reservoir." Special Master Report 309.

[25] Indeed, the Department of the Interior observed in 1946 that the administrative practice under § 46 had usually been "to refuse to deliver water to any lands, excess or nonexcess, until the owner of excess land has executed the recordable contract agreeing to dispose of the excess." Department of Interior, Landownership Survey on Federal Reclamation Projects 47 (1946).

land limitation provisions of § 46 of the 1926 Act or to any similar provisions of the reclamation laws.[26]

## IV

The legislative history of the Project Act, which spans several years, raises no doubt in our minds about the foregoing construction of the Act.[27] Our attention has been called to nothing in the relevant materials indicating that although Congress was careful to preserve present perfected rights in § 6, other provisions of the Project Act were nevertheless intended to invoke acreage limitation with respect to lands already being irrigated in Imperial Valley by means of water diverted from the Colorado River and delivered to the Valley by the District's own works. Indeed, the version of the Project Act passed in the House contained an express acreage limitation applicable to all privately owned lands; but the Senate substituted the provisions of its own bill, which did not contain an acreage limitation expressly applicable to lands then being irrigated, and it was this version which became the Project Act despite objections in the Senate that the bill should be amended to limit water deliveries to 160 acres under single ownership. There is nothing in this chain of events to suggest that Congress intended § 14, by bringing the 1926 Act into play, to interfere with the delivery of water to those lands already under irrigation in Imperial Valley and having present perfected rights that the Secretary was bound to

---

[26] The United States urges that § 6 merely specifies priorities among those entitled to water from the Project and is irrelevant in determining entitlement itself. The argument has no merit.

[27] The Project Act was the result of the fourth attempt by Congressman Swing and Senator Johnson of California to cause the Federal Government to move forward with such an undertaking. Their first bills were introduced in 1922, in the 67th Congress. The fourth set of bills, which were successful, were introduced in 1927, in the 70th Congress. Congressional action was completed on December 18, 1928, and the President's signature followed on December 21 of that year.

recognize.[28]   If anything, the inference from the legislative history is to the contrary.   This is not to say that we rely strongly on legislative materials in construing the Project

[28] Respondents point out that although the District was to repay the cost of the All-American Canal and the Imperial Dam, the repayment obligation carried no interest.   We should not hold, it is urged, that Congress intended this permanent subsidy to large landholders.   Rather, we should find that the benefits of the Project to the District justify the application of § 46 and the requirement that excess landholdings be sold.   We think, however, that Congress struck the balance between public and private rights and determined to respect those rights to Colorado River water that had been put to use as of 1929.   The Project Act recited its purposes as "controlling the floods, improving navigation and regulating the flow of the Colorado River, providing for storage and for the delivery of the stored waters thereof for reclamation of public lands and other beneficial uses exclusively within the United States. . . ."   Section 1 of the Act, 45 Stat. 1057, 43 U. S. C. § 617.   The 1932 contract between the District and the United States contained nearly identical recitals as to the purposes of the Project.   It also recited that there were public lands already within the District and required that substantial additional acreages of public and private lands be included within the District.   The District Court found that certain national interests were advanced by the Project:

"1) The inclusion within the District by annexation, pursuant to Article 34 of the contract between the Government and the District dated December 1, 1932, of some 250,000 acres of Government lands.

"2) Added capacity in the Canal for the servicing of such lands and some 11,000 acres of Indian land.

"3) Flood control for the purpose of preserving the Laguna Dam and protecting the Yuma Reclamation Project as well as protecting the public lands and private interests in Imperial Valley.

"4) The control of silt because of the federal government's problem in handling silt in the Yuma Project.

"5) The need to build a canal on All-American soil to put the United States in a position to bargain with the Mexican Government over the use of the water of the Colorado River.

"6) It enabled the United States Government to reclaim and put to use large tracts of public and Indian lands of the United States in Coachella Valley."   322 F. Supp., at 19.

The District Court concluded that Congress was aware of the water rights held in Imperial Valley and determined to exempt them from the acreage limitations "in recognition of the fact that the All-American Canal Project

Act. Statements by the opponents of a bill and failure to enact suggested amendments, although they have some weight, are not the most reliable indications of congressional intention. *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 204, n. 24 (1976); *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 381–382, n. 11 (1969). But we do say that the respondents have not called our attention to anything in the hearings, Committee Reports or floor debates suggesting in any substantial way that our construction of the Project Act is in error.

---

was not merely an arid lands reclamation project, but was a special purpose program designed for national purposes, including water negotiations with Mexico, as well as for regional agricultural development." *Id.*, at 22.

The Senate Report on S. 728, S. Rep. No. 592, 70th Cong., 1st Sess. (1928), stated several purposes of the Project, one of which was that it would "end an intolerable situation, under which the Imperial Valley now secures its sole water supply from a canal running for many miles through Mexico, as well as make possible the reclamation of public lands lying around the rim of the present cultivated section of the valley." *Id.*, at 8. The Report also stated as follows:

"The all-American canal will carry a portion of the conserved waters to where they can be used for irrigation and domestic purposes. Looked at in a somewhat narrow way, it represents a cooperative enterprise between Imperial irrigation district, which serves the present irrigated area in Imperial Valley, the Coachella County water district, a public district embracing in its limits the Coachella Valley, and the United States as owner of approximately 200,000 acres of public land about the rim of Imperial Valley, and about 11,000 acres of Indian lands now without water but possessing the same possibilities of development with water as the fertile lands in the valley. Neither Imperial irrigation district, the Coachella district, nor the United States could afford alone to build a canal from the river. Acting in conjunction, the canal is entirely feasible." *Id.*, at 21.

The House Report on H. R. 5773, H. R. Rep. No. 918, 70th Cong., 1st Sess., 6 (1928), also identified one of the purposes of the Project as ending the "intolerable situation" which existed in Imperial Valley:

"This valley now secures its sole water supply by a canal which runs for some 60 miles through Mexico. The all-American canal will furnish a substitute for this and at the same time carry the water at an elevation sufficient to make possible, at some future date, the irrigation of additional land, mostly public, lying about the rim of the cultivated area."

There can be little question that the contemporary construction of the Project Act by the parties to the 1932 contract was that the acreage limitation did not apply to lands in the District presently being irrigated. Secretary Wilbur, in his letter of February 24, 1933, stated that early in the negotiations on the All-American Canal contract, the question was raised as to the 160-acre limitation, and the view was reached that the limitation did not apply to lands that were under cultivation and having a present water right.[29]   There is no reason to doubt that the parties went forward on this basis, especially since language in early drafts of the contract which might have indicated an acreage limitation was eliminated in the course of the negotiations.   The Imperial Valley system was a going concern at the time, and the Alamo Canal continued to supply the water to the Valley for another 10 years. It is thus a fair inference that both the Imperial Valley landowners and the United States proceeded on the assumption that the 160-acre limit was of no concern to those who were receiving water from the Alamo Canal.   This contemporaneous view of the Project Act, which supports our own construction of the legislation, was not officially repudiated by the Secretary until 1964.   It is also a matter of unquestioned fact that in the ensuing years the Secretary has delivered water to the District pursuant to its contract and that the 160-acre

---

[29] The matter had been called to the Secretary's attention by a memorandum of February 7 from Porter W. Dent, the Assistant Commissioner and General Counsel of the Bureau of Reclamation.   His memorandum contained almost identical language to that in the Secretary's later letter. Mr. Dent said:

"Early in the negotiations connected with the All-American Canal contract the question was raised regarding whether and to what extent the 160-acre limitation is applicable to lands to be irrigated from this proposed canal. So far as I am advised, all who have given this matter consideration agree that this limitation does not apply to lands now cultivated and having a present water right.   The view has been, and is, I believe, that these lands having already a water right, are entitled to have such right recognized without regard to the acreage limitation mentioned."   App. 220a.

provision of the reclamation laws has to this date never been an operative limitation with respect to lands under irrigation in 1929.[30]

## V

There remains a further consideration. The parties stipulated and the District Court found that at the outset of this litigation, the District was irrigating approximately 14,000 more acres than the 424,145 acres under irrigation in 1929. If, in light of our perfected rights holding, an Art. III case or controversy remains with respect to the applicability of

---

[30] This was the case despite the fact that in 1945 in the course of concluding that the lands in Coachella Valley were subject to the acreage limitation, the Department's Solicitor also took exception to the Wilbur view with respect to Imperial Valley. The Solicitor's opinion, however, totally ignored the existence of present perfected rights in Imperial Valley and their absence in Coachella. His view as to Imperial Valley did not prevail, in any event, for in 1948, Secretary Krug expressly declined to depart from the Department's consistent adherence to the Wilbur view that the Project Act did not require limiting water deliveries in Imperial Valley to 160 acres under single ownership. Furthermore, in 1952, when the District and the Department negotiated a revision of the 1932 contract in some respects, there was no effort made by the Department to insist on a limitation provision.

The Department's repudiation of its prior position in 1964 was based on its Solicitor's view that § 46 of the 1926 Act applied to Imperial Valley by virtue of § 14 of the Project Act and that under that section no farmer in Imperial Valley could have project water for more than 160 acres of land. Excess lands must either be sold or the District must deny water to them. The Solicitor's opinion, however, gave only cursory attention to § 6. After stating that the proper rule of construction in cases such as he was considering was that "rights, privileges and immunities not expressly granted are reserved," the opinion went on to conclude:

"For the same reason the requirement in section 6 for 'satisfaction of present perfected rights' cannot be read as insulating the District lands from acreage limitation. It is not in plain terms an exemption from the limitations of reclamation law in connection with the obligation to repay the cost of Imperial Dam and the All-American Canal." 71 I. D., at 511.

We agree with the District Court's conclusion that this is a totally inadequate conception of perfected rights.

acreage limitations to this additional 14,000 acres, there would remain to be disposed of those arguments of petitioners for reversing the Court of Appeals which we have not addressed and which, if sustained, would exempt from acreage limitations all privately owned lands in Imperial Valley, a result which the District Court seemingly embraced.[31]  The parties, however, have not separately addressed the status of this additional 14,000 acres; nor does the record invite us to deal further with this case without additional proceedings in the lower court.  We do not know, for example, whether the District is still irrigating the additional 14,000 acres, whether any of the 14,000 acres consists of lands held in excess of 160 acres, or whether for some other reason of fact or law there is not now a controversy that requires further adjudication. Even if a live dispute remains, it would be helpful to have the Court of Appeals, or the District Court in the first instance if the Court of Appeals deems it advisable, adjudicate the status of the 14,000 acres, freed of any misapprehensions about the applicability of the 160-acre limitation to lands under irrigation in 1929.

Accordingly, the judgment of the Court of Appeals is reversed with respect to those lands that were irrigated on June 25, 1929, and with respect to which the District has been

---

[31] Petitioners contend that contrary to 28 U. S. C. § 1738, the Court of Appeals failed to give the same full faith and credit to the *Hewes* decision as that decision would have by law or usage in the courts of California. They urge that the United States embraced and consistently adhered to a construction of the Project Act that would exempt from acreage limitations all privately owned lands in the District, a position which the Government should not now be permitted to repudiate.  They also argue that quite apart from § 6, the structure and other provisions of the Project Act negate the applicability of acreage limitations to privately owned lands in Imperial Valley.  Finally, they present a view of the legislative history of the Project Act that they claim supports the inference that Congress intended to exempt from acreage limitations any and all lands that the District might subsequently take into itself and irrigate with project water.

adjudicated to have a perfected water right as of that date. The judgment is otherwise vacated, and the case is remanded to that court for further proceedings consistent with this opinion.[32]

*So ordered.*

---

[32] We note, further, that there has passed the Senate and is pending in the House a measure that would exempt lands in the District from the reach of acreage limitations in the reclamation law.