**COPPER & BRASS FABRICATORS COUNCIL, INC., Appellant,**

v.

**DEPARTMENT OF THE TREASURY, et al., Appellees.**

**No. 81–2091.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 19, 1982.

Decided June 4, 1982.

Arvid E. Roach, II, with whom Theodore L. Garrett, Washington, D. C., was on the brief, for appellant.

Rebecca Ross, Asst. U. S. Atty., with whom Kenneth M. Raisler, Royce C. Lamberth, Asst. U. S. Attys., and Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, were on the brief, for appellees.

Before TAMM and GINSBURG, Circuit Judges, and PALMIERI,* United States Senior District Judge for the Southern District of New York.

Opinion for the Court filed by Senior District Judge PALMIERI.

Opinion concurring in the result filed by Circuit Judge GINSBURG.

PALMIERI, District Judge:

Appellant, a trade association of copper and brass fabricating companies, challenges the Treasury Department's decision to decrease the copper content of the penny from 95% copper and 5% zinc to a copper-plated zinc blank containing 2.4% copper and 97.6% zinc. This decision was made pursuant to 31 U.S.C. § 317(b) (1976),[1] which was enact-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Section 317(b) reads:

"Whenever in the judgment of the Secretary of the Treasury such action is necessary in order to assure an adequate supply of coins to meet national needs, he may prescribe such composition of the copper and zinc in

ed by Congress in 1974 in response to rising copper prices and the withdrawal from circulation of substantial quantities of pennies as a result of the public hoarding which followed. The district court, 524 F.Supp. 945, held that while appellant's alleged economic injury was sufficient to meet the constitutional requirement of an "injury in fact," appellant was not within the "zone of interests" protected, benefited or regulated by the statute, 31 U.S.C. § 317(b), and consequently lacked standing to challenge the Treasury Department's decision. We agree. In light of our recent decision in *Control Data Corp. v. Baldridge*, 655 F.2d 283 (D.C. Cir.), *cert. denied*, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981), in which we discussed the "zone of interests" test, our decision can be brief.

■ The zone of interests standard, as *Control Data* explains, requires some indicia—however slight—that the litigant before the court was intended to be protected, benefited or regulated by the statute under which suit is brought. Our review of the relevant statutory provision, section 317(b), and its legislative history reveals no indication that Congress intended to protect, benefit or regulate appellant. Section 317(b), on its face, reveals no such purpose; rather, it clearly purports to grant the Secretary of the Treasury discretion to prescribe the copper and zinc composition "as he may deem appropriate" and as "is necessary in order

to assure an adequate supply of coins to meet national needs."

The legislative history of the statute confirms this conclusion. Prior to the enactment of section 317(b) in 1974, the law did not provide the Secretary of the Treasury with discretion to alter the copper content of pennies; it merely prescribed that pennies would be composed of 95% copper and 5% zinc. In the face of rising copper prices and penny hoarding by the public, legislation was introduced which would vest discretion in the Treasury Department to change the copper content and substitute a less costly metal in response to the above trends. The initial proposal, S. 2795, envisioned aluminum as a substitute for copper and was favorably reported out of committee and passed the Senate without debate.[2] In the House, however, as H.R. 11841, the proposal met with strong opposition from the vending machine industry which feared that the coins would jam its machines and from medical experts in the fields of pediatrics and radiology who testified that x-rays would not detect an aluminum penny if ingested by a child.[3] In response to the above groups' objections, H.R. 16032 was enacted and codified as 31 U.S.C. § 317(b) and (c), to substitute zinc rather than aluminum for copper.[4]

■ While Congress thus took into consideration the interests of vending machine

the alloy of the one-cent piece as he may deem appropriate. Such one-cent pieces shall have such weight as may be prescribed by the Secretary."

2. S.Rep.No.93–622, 93d Cong., 1st Sess. (1973); 119 Cong.Rec. 41550 (Dec. 14, 1973).

3. *See To Authorize a Change in the Composition of the One-Cent Coin: Hearing Before the Subcommittee on Consumer Affairs of the House Committee on Banking and Currency*, 93d Cong., 2d Sess. (1974 hearing).

4. Section 317(c) gave the Secretary authority to alter the composition of the penny to "such other metallic composition as he shall determine" if the use of copper became impracticable and if certain procedural prerequisites were met. This section expired on December 31, 1977. Appellant argues that the time-limited,

broad authorization in 317(c) suggests that 317(b) should be given a narrower reading. We disagree. The apparent legislative scheme evidenced by these two subsections was to permit, in subsection (c), temporary flexibility to the Treasury due to uncertainty over the technical feasibility of producing an economical copper-zinc penny which possessed the necessary manufacturing and circulation qualities. It was believed that the lowest copper content technologically possible to achieve—considering damage to the dies and the weight of the coin—was 70%. Apparently, therefore, subsection (c) permitted temporary flexibility to explore alternatives to the copper-zinc penny, provided for in subsection (b), in light of these technical and practical considerations. Appellant has presented us with no evidence to the contrary.

operators and children who might ingest coins in amending section 317, there is no indication that Congress intended this legislation to benefit, protect or regulate the copper industry.[5] Rather, the economic interests of the copper industry appear to be directly at odds with the "national needs" compelling the enactment of section 317(b). It is clear from the legislative history of section 317(b) that, in the face of rising copper prices and the resulting hoarding of pennies by the public, Congress intended to grant the Treasury Department broad discretion to decrease the copper content of the penny "to meet national needs." This clear intent to permit discretionary reduction in copper content, in favor of zinc, can in no respect be viewed as an intent to benefit or protect the copper industry; rather, the statutory interests and appellant's interests are incongruent. It follows that appellant does not fall within the zone of interests sought to be protected, benefited, or regulated by section 317(b). *Control Data Corp. v. Baldridge, supra,* 655 F.2d at 295.

*Affirmed.*

**5.** We are not persuaded by appellant's argument that a one-page letter submitted by Olin Brass Corporation and placed in the hearings record by Mary T. Brooks, Director of the Bureau of the Mint, signals a possible legislative interest in the welfare of the copper industry. Appellant suggests that because of this letter, the Administration retreated from the aluminum coin proposal stating that it was "sensitive to any hardship or expense this may force upon individuals or *industries* of our country." Brief for Appellant at 9–10, 46. This argument is without merit. When Ms. Brooks made the above statement, Olin Brass' letter was not in the record as was no other testimony or evidence in support of the copper industry's position. The statement apparently refers to the vending machine industry which had voiced strong opposition to the aluminum legislation.

**1.** *See United States v. Martino,* 664 F.2d 860, 881 (2d Cir. 1981) (Oakes, J., concurring).

**2.** *See Investment Co. Inst. v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); *Arnold Tours, Inc. v. Camp,* 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970) (per curiam); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Association of Data Pro-*

GINSBURG, Circuit Judge, concurring in the result:

As the opinion of the court correctly observes, our recent decision in *Control Data Corp. v. Baldridge,* 655 F.2d 283 (D.C.Cir.), *cert. denied,* 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981), prescribes the manner in which the "zone of interests" test is to be applied in this Circuit. At 951–952. I therefore concur in the result reached today. However, I write separately (1) to emphasize the need for "further enlightenment from Higher Authority"[1] as to the vitality and proper application of the "zone" test, and (2) because I am uncertain whether the *Control Data* standard, which constitutes the law of this Circuit, is fully consistent with the leading Supreme Court decisions announcing and applying the "zone" test.

I.

In suits brought under the Administrative Procedure Act, the Supreme Court has employed the "zone of interests" test, first adopted in 1970, as the foundation for its decision on four occasions,[2] the latest in 1971.[3] Despite trenchant criticism of the

*cessing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

In each of these decisions, the Court noted "a growing trend 'toward enlargement of the class of people who may protest administrative action,' " *Arnold Tours, supra,* 400 U.S. at 46, 91 S.Ct. at 159 (quoting *Data Processing, supra,* 397 U.S. at 154, 90 S.Ct. at 830); it utilized the "zone" test to reverse lower court decisions which had held that the respective plaintiffs lacked standing because they had failed to show a "legal interest" protected by the statutory scheme in question.

**3.** *Investment Co. Inst. v. Camp, supra.*

The "zone" test served as the basis for the Court's decision on only one other occasion. In a 1977 challenge to New York State's securities transaction tax, the Court ruled that out-of-state stock exchanges, "asserting their right ... to engage in interstate commerce free of discriminatory taxes on their business," were " 'arguably within the zone of interests to be protected' " by the Commerce Clause. *Boston Stock Exch. v. State Tax Comm'n,* 429 U.S. 318, 320–21 n.3, 97 S.Ct. 599, 602–03 n.3, 50 L.Ed.2d 514 (1977) (quoting *Data Processing, supra,* 397 U.S. at 153, 90 S.Ct. at 830).

test[4] and a pronouncement of its demise,[5] the Court has recently reaffirmed, in dicta, that the "zone" test remains one of the "prudential principles that bear[s] on the question of standing." *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.,* —— U.S. ——, —— – ——, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982). *See also Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100 n.6, 99 S.Ct. 1601, 1608 n.6, 60 L.Ed.2d 66 (1979). Other post-1971 High Court decisions, however, appear inharmonious with these recent, approving references. Without mentioning the "zone" test, the Court has rejected objections that certain plaintiffs lacked standing, although application of the test arguably would have yielded a different result. *See, e.g., Bryant v. Yellen,* 447 U.S. 352, 366–68, 100 S.Ct. 2232, 2240– 41, 65 L.Ed.2d 184 (1980); *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 62–63, 96 S.Ct. 2831, 2837–2838, 49 L.Ed.2d 788 (1976); *see also* K. Davis, *Administrative Law Treatise* § 22.02–11, at 348–51 (Supp.1982).[6]

The absence of a cogent explanation by the Supreme Court of the purpose, scope, or proper application of the "zone of interests" test has bred confusion and divergent approaches among lower federal courts. As this court observed in *Tax Analysts & Advocates v. Blumenthal,* 566 F.2d 130, 139 (D.C.Cir.1977),

> [s]ome courts have chosen to ignore the zone test; at least one circuit court has chosen forthrightly to state its opposition to the test. Perhaps the most common

pattern is to announce in conclusory terms that the zone standard has or has not been satisfied.

(Footnotes omitted.) The current uncertain and uneven declarations and applications of the "zone" test, demonstrating the insecurity lower federal courts feel in this area, will continue until the Supreme Court speaks again, and with a clear voice.

## II.

It is less than apparent that the standard adopted in *Control Data,* and applied today, is altogether consistent with the terse instruction provided by the Supreme Court concerning the "zone" test's proper application. As the opinion of the court points out, the *Control Data* standard "requires some indicia ... that the litigant before the court *was intended* to be protected, benefitted or regulated by the statute under which suit is brought." At 952 (emphasis added). However, the "zone" test announced by the Supreme Court requires only that the litigant be "*arguably* within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Data Processing, supra,* 397 U.S. at 153, 90 S.Ct. at 830 (emphasis added). Further, *Control Data* identifies the statute's legislative history as pertinent to the standing inquiry. 655 F.2d at 294. But the Supreme Court's *Arnold Tours* decision raises significant doubt whether examination of legislative history is proper when applying the "arguably within the zone of interests" test. 400 U.S. at 46, 91 S.Ct. at 159.[7] Finally, I have

---

4. *See Barlow v. Collins, supra,* 397 U.S. at 168–73, 90 S.Ct. at 838–841 (Brennan, J., joined by White, J., concurring in the result and dissenting); Albert, *Standing to Challenge Administrative Action: An Inadequate Surrogate for Claim for Relief,* 83 Yale L.J. 425, 493–96 (1974); K. Davis, *Administrative Law Treatise* § 22.00–3, at 711–22 (Supp.1970). Professor Davis argues with force that the "zone of interests" test is "(1) analytically faulty, (2) contrary to much case law the Court could not have meant to overrule, (3) cumbersome, inconvenient, and artificial, and (4) contrary to the congressional intent in the Administrative Procedure Act." *Id.* at 711–19.

5. In 1976, Professor Davis asserted that the zone test was "extinct ... as it should [be]." Davis, *Standing, 1976,* 72 Nw.U.L.Rev. 69, 81 (1977).

6. By Professor Davis' count, "at least 25 Supreme Court opinions on standing since 1970 do not mention the 'zone' test even though it could be relevant to most of the opinions." *Administrative Law Treatise, supra,* § 22.02– 11, at 347 (Supp.1982).

7. *See also* Albert, *supra,* note 4, at 496 & n.336.

reservations about employing a test, initially adopted to "enlarge[ ] the class of people who may protest administrative action," *see supra* note 2, to curtail court access where the party seeking judicial review alleges a palpable injury in fact, an injury plainly occasioned by the challenged action, one which would be prevented or redressed by the relief requested. *Cf. Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 80–81, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978) ("Where a party champions his own rights [as distinguished from those of a third party], and where the injury alleged is a concrete and particularized one which will be prevented or redressed by the relief requested, the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met.").

### III.

In the case before us the district court, following *Control Data,* correctly ruled that the copper fabricators' trade association adequately alleged "injury in fact." Nor is there room for genuine doubt that a "substantial likelihood [exists] that the judicial relief requested will prevent or redress the claimed [economic] injury." *Duke Power, supra,* 438 U.S. at 79, 98 S.Ct. at 2633. As the copper fabricators read 31 U.S.C. § 317(b) and (c), the copper industry's interests lie within the zone of interests the statute protects.[8] The copper fabricators may be incorrect, but the coincidence of interests asserted and developed at length in their briefs seems to me "arguable."

Nonetheless, in view of the *Control Data* "indicia of intent" requirement, I cannot dissent from the court's judgment.[9] Were

redressable "injury in fact" the sole test for standing, the copper fabricators would clear the first threshold to adjudication of their claim.[10] How much more the "zone" test demands and even the situations in which the test applies present questions left murky by the Supreme Court. Clarification from the Court would facilitate the expeditious, even-handed disposition of standing controversies by lower courts.

---

**8.** Appellant's brief stresses, *inter alia,* that in section 317(c) Congress gave the Secretary of the Treasury circumscribed authority to "change the alloy of the one-cent piece" to a metallic composition other than copper and zinc and that the authorization for such a change expired on December 31, 1977. Section 317(b), which merely authorizes prescription of the proportions of copper and zinc in the alloy of the one-cent piece, appellant urges, mandates an alloy in which copper is the principal ingredient. *See* Brief for Appellant at 12 n.10.

**9.** Appellant has presented no tenable distinction between this case and *Control Data,* nor does it appear that the two cases are rationally placed in different compartments.

**10.** Appellee also urged dismissal on the ground that the administrative action in question is unreviewable because it is clearly committed to agency discretion and the judgment of the Secretary of the Treasury. This question was not reached by the district court.