777 F.2d 433
 2 Fed.R.Serv.3d 578
 NL INDUSTRIES, INC., a New Jersey corporation, Plaintiff-Appellee,
v.
SECRETARY OF the INTERIOR OF the UNITED STATES of America, Defendant,
and
All Minerals Corporation, a Nevada corporation, Defendant in
Intervention- Appellant.
 No. 84-2344.
 United States Court of Appeals,
Ninth Circuit.
 Argued March 15, 1985.
Submitted May 29, 1985.
Decided July 25, 1985.
As Amended on Denial of Rehearing
and Rehearing En Banc
Dec. 4, 1985.
 
 Earl M. Hill, Thomas P. Erwin, Hill, Cassas, Delipkau & Erwin, Reno, Nev., Don H. Sherwood, James M. King, Sherman & Howard, Denver, Colo., for plaintiff-appellee.
 Hugh C. Garner, Thomas A. Mitchell, Salt Lake City, Utah, for All Minerals Corp.
 Appeal from the United States District Court for the District of Nevada.
 Before WALLACE and POOLE, Circuit Judges, and STEPHENS,* District Judge.
 WALLACE, Circuit Judge:
 
 
 1
 All Minerals Corporation (AMC) appeals from the district court's order reversing a decision of the Interior Board of Land Appeals (Board) which held that an unpatented mining claim filed by NL Industries (NL) had been forfeited for failure to comply with the filing requirements of section 314(a) of the Federal Land Policy and Management Act, 43 U.S.C. Sec. 1744(a). We have jurisdiction under 28 U.S.C. Sec. 1291. We reverse the district court and reinstate the Board's decision.
 
 
 2
 * NL and AMC each held unpatented mining claims located on federal land in Nevada. Both the NL and the AMC claims originated from exploration that took place in 1967. Several of the NL and AMC claims were in conflict. In October 1979, NL filed a civil action against AMC in Nevada state court to determine ownership of the conflicting claims and to "resolve issues of priorities of location concerning the conflicting claims." That case is still pending.
 
 
 3
 On October 21, 1976, the Federal Land Policy and Management Act (the Act), 43 U.S.C. Secs. 1701-1782, became effective. Section 314(a), codified at 43 U.S.C. Sec. 1744(a), mandates the initial recording of unpatented mining claims with the federal government and the annual filing of affidavits of assessment work. NL initially recorded its claim involved in this case on December 7, 1977, and filed evidence of assessment work on December 14, 1977. NL failed to file evidence of assessment work or a notice of intention to hold the claim during 1978. NL did, however, file such evidence for the year 1979 on September 20, 1979. During the pendency of NL's state court suit against AMC, the Nevada office of the Bureau of Land Management (Bureau) issued two decisions invalidating both the NL and the AMC claims for failure to comply with the Act's filing provisions. The Bureau deemed both the NL and AMC claims conclusively abandoned pursuant to section 314(c), 43 U.S.C. Sec. 1744(c). NL and AMC each appealed to the Board.
 
 
 4
 AMC was granted leave to intervene as a party in NL's Board appeal based upon AMC's status as defendant in the NL state court suit. In AMC's own appeal to the Board, the Board affirmed the decision of the Bureau that AMC's claims were invalidated. AMC took no appeal from this decision. AMC had, however, previously attempted to relocate its claim so that, in the event both NL's and AMC's original claims were invalidated, AMC could argue that it had first right to the claims.
 
 
 5
 NL also lost its appeal to the Board, which affirmed that NL's claims were abandoned and void for noncompliance with the filing provisions of the Act. NL appealed that decision to the district court of Nevada. AMC was again allowed to intervene as of right under Fed.R.Civ.P. 24(a) because of its interest in NL's disputed mining claims. If the district court had affirmed the Board decision, AMC could have argued that it was the prevailing claimant to the NL claims invalidated by the Board.
 
 
 6
 The district court granted summary judgment in favor of NL, reversing the Board, and ordered the Secretary of the Interior (the Secretary) to reinstate NL's claims. The district court stated that the Board's decision was arbitrary, capricious, and an abuse of discretion, and that the Board's interpretation of the filing requirements of the Act exceeded the statutory authority granted by Congress. The Secretary did not appeal this decision, but instead prepared to reinstate NL's claims. As a defendant/intervenor, however, AMC filed this timely appeal.
 
 II
 
 7
 The order to restore NL's unpatented mining claims is directed to the Secretary, who has chosen not to appeal. We must first determine whether AMC as an intervenor may properly bring this appeal.
 
 
 8
 AMC asserted an interest in the specific claims of NL that were being adjudicated in the district court. Moreover, AMC's interest in the property was significantly different from the Secretary's interest in these claims. Thus, the Secretary could not adequately represent AMC. AMC therefore clearly met the test of a proper intervenor under Fed.R.Civ.P. 24(a).
 
 
 9
 In determining whether an intervenor may subsequently appeal from a decision not being appealed by one of the parties in the district court, the test is whether the intervenor's interests have been adversely affected by the judgment. See Shaff v. United States, 695 F.2d 1138, 1140 n. 1 (9th Cir.), cert. denied, 464 U.S. 821, 104 S.Ct. 85, 78 L.Ed.2d 94 (1983); Cerro Metal Products v. Marshall, 620 F.2d 964, 969 (3d Cir.1980) ("the general rule [is] that an intervenor may appeal from any order adversely affecting the interest that served as a basis for intervention") (footnote omitted). In this case, the district court's decision to restore NL's claims undermined AMC's argument that it possessed a claim to the property based on its 1979 relocations. Thus, AMC is entitled to bring this appeal because its interests have been adversely affected. See Bryant v. Yellen, 447 U.S. 352, 366-68, 100 S.Ct. 2232, 2240-41, 65 L.Ed.2d 184 (1980) (government's failure to appeal does not deprive intervenor of ability to appeal adverse judgment) (Bryant).
 
 III
 
 10
 NL argues that this appeal should nevertheless be dismissed as moot because the district court's order to reinstate the NL mining claims was directed to the Secretary, who neither appealed nor moved for a stay of the judgment. NL contends that the order is therefore final, unappealable and conclusive, with no relief available to AMC even if it wins its appeal on the merits.
 
 
 11
 NL relies on In re Combined Metals Reduction Co., 557 F.2d 179 (9th Cir.1977), a case in which ten appeals regarding properties sold or leased by a trustee in bankruptcy to third parties were declared moot. In that case, we observed that, as to several of the properties, a reversal of the district court's order would be ineffective to unwind the already concluded transactions. We pointed out that in order for the appellant to obtain relief "he would be required to bring a new action" to set aside the transactions "and join the buyers and lessees as parties." Id. at 189.
 
 
 12
 AMC faces no such hurdles. NL is already a party to the action. We are not dealing with third party bona fide purchasers for value, but rather with a party fully aware of AMC's claims. It is true that the Secretary has not appealed the order to reinstate the NL mining claims, but he was a party in the district court action. Although the record indicates that the Secretary has implemented the district court's order, it must be assumed that he remains fully aware of this appeal. AMC sought stays of the judgment in both the district court and in this court after posting a supersedeas bond, which motions were served on the Secretary. They were denied only on the basis that AMC failed to show any irreparable harm resulting from not entering a stay.
 
 
 13
 Our case is unlike the situation in Combined Metals in which the disputed properties were no longer within the court's jurisdiction, leaving us "powerless to do anything more than simply point out the circumstances of the district court's ruling." Id. at 192. Here, a decision in this case could clearly provide AMC the relief that it seeks.
 
 
 14
 AMC has done all that it could to preserve its clear right to appeal the district court's decision, see Bryant, 447 U.S. at 366-68, 100 S.Ct. at 2240-41 (government's failure to appeal adverse judgment does not deprive intervenor of right to bring appeal), when it sought stays both in the district court and here. When AMC's notice of appeal was filed, we inherited jurisdiction over the entire case and controversy under 28 U.S.C. Sec. 1291. Should we find the district court in error, we can order it to direct the Secretary to reinstate the Bureau decision. There is no need to assert jurisdiction over third parties who have not been involved in this litigation, as in Combined Metals, nor is there any property involved that is beyond the jurisdiction of the district court.
 
 
 15
 We agree with AMC that a finding of mootness under these circumstances "would be to make the appellate process meaningless to any defendant whose fellow defendant did not seek reversal of an adverse judgment." Simply because the Secretary is not a party to this appeal does not mean that the Secretary was not a party to the proceedings over which the district court had jurisdiction. The Secretary's failure to appeal only means that he cannot raise any objections in this court; it cannot act as a unilateral termination of an appeal by another party to the proceedings. See Geneva Towers Tenants Organization v. Federated Mortgage Investors, 504 F.2d 483, 485 n. 2 (9th Cir.1974) (compliance with judgment by one defendant that moots its ability to appeal "in no way jeopardizes" the ability of other parties to appeal). "Nothing has transpired that has deprived this Court of the power to affect the rights of the litigants in this case." Burbank Anti-Noise Group v. Goldschmidt, 623 F.2d 115, 116 (9th Cir.1980) (per curiam) (distinguishing Combined Metals because "all parties to the transactions are before the Court"), cert. denied, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981). We therefore hold that this appeal is not moot.
 
 IV
 
 16
 We review the district court's grant of summary judgment de novo. Lojek v. Thomas, 716 F.2d 675, 677 (9th Cir.1983). In reviewing the Board's decision, however, "[o]ur review is limited to an examination of whether the decision of the Board was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or not in accordance with the law." Melluzzo v. Watt, 674 F.2d 819, 820 (9th Cir.1982) (per curiam).
 
 
 17
 This case turns upon the interpretation of the word "thereafter" in section 314(a), 43 U.S.C. Sec. 1744(a). That section requires that:
 
 
 18
 The owner of an unpatented lode or placer mining claim located prior to October 21, 1976, shall, within the three-year period following October 21, 1976, and prior to December 31 of each year thereafter, file the instruments required by paragraphs (1) and (2) of this subsection.
 
 
 19
 43 U.S.C. Sec. 1744(a) (emphasis added). The statute clearly provides a grace period for the filing of an initial claim for the first three years following the effective date of the Act: between 1977 and 1979. The question before us, however, is whether the subsequent annual reports must be filed in the year following any initial recordation prior to 1979, or whether such annual reports are only required beginning in 1980, regardless of the year in which the claim was initially recorded provided that it was recorded before the end of 1979.
 
 
 20
 The Secretary in his decisions and regulations has interpreted "thereafter" to refer to each year following the initial filing by the owner of an unpatented mining claim, regardless of when the claim was initially recorded. See Harvey A. Clifton, 60 I.B.L.A. 29, 35 (Nov. 16, 1981). Under the regulations in effect in 1977, the first filing of evidence of assessment work with the Bureau triggered the subsequent annual filing requirement:
 
 
 21
 The owner of an unpatented mining claim located on Federal land, excluding land within units of the National Park System, on or before October 21, 1976, shall file before October 22, 1979, and prior to December 31 of each calendar year following the calendar year of recording in the proper BLM office pursuant to this subpart evidence of annual assessment work performed during the preceding assessment year or a notice of intention to hold the mining claim.
 
 
 22
 43 C.F.R. Sec. 3833.2-1(a)(1) (1977) (emphasis added) (current version at 43 C.F.R. Sec. 3833.2-1(b)(1) (1984)).
 
 
 23
 NL filed its first location certificates and affidavits of assessment work with the Bureau in 1977, and filed further affidavits of assessment work for calendar year 1979. NL failed to file, however, with the federal office in 1978, although it did make such filings with the State of Nevada during that year. Although NL contended that it had in fact filed the necessary documents during 1978 in the normal course of business practices, and that the Nevada state filings during 1978 evidenced this practice, it conceded that there was no actual proof that the Bureau filings had been made. See NL Baroid Petroleum Services, 60 I.B.L.A. 90, 92 (Nov. 19, 1981). According to the Board, NL's initial 1977 filing necessitated an annual filing in 1978, even though NL was not required to file initially until October 1979 (the end of the three year grace period). In reaching its decision, the Board specifically held that NL had failed to comply with the statutory as opposed to the regulatory requirement, and thus curative action was unavailable. Id. at 93.
 
 
 24
 NL contends that the plain language of the statute clearly shows that annual filings are not mandated until after October 21, 1979. It asserts that October 1976 to October 1979 is a comprehensive three year grace period for purposes of annual as well as initial filings, and that owners of pre-1976 mining claims have until October 1979 to be in full compliance with the law.
 
 
 25
 In Western Mining Council v. Watt, 643 F.2d 618 (9th Cir.), cert. denied, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981), we found that certain Department requirements for the filing of unpatented mining claims were not arbitrary and unreasonable. In a footnote we suggested in dictum that annual filings might be necessary only after October 21, 1979:
 
 
 26
 43 U.S.C. Sec. 1744(a) requires owners of unpatented mining claims to file either a notice of intention to hold the mining claim, an affidavit of assessment work, or a detailed report provided in 30 U.S.C. Sec. 28-1, in the office where the location notice or certificate is recorded. This section also requires that a copy of such instrument be filed in the office of Bureau of Land Management, designated by the Secretary with a description of the location of the mining claim. For claims located before the effective date of the Act, October 21, 1976, these instruments were required to be filed by October 21, 1979, and prior to December 31 of each year thereafter.
 
 
 27
 643 F.2d at 627 n. 13. See Oregon Portland Cement Co. v. United States Department of the Interior, 590 F.Supp. 52, 58 (D.Alaska 1984) (" 'thereafter' [modifies] the phrase 'within the three year period' ").
 
 
 28
 Since Oregon Portland Cement and after oral argument in this case, the Supreme Court decided United States v. Locke, --- U.S. ----, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985). Locke addressed several issues regarding the Act, including: (1) whether section 314(a) of the Act required forfeiture of a claim when an annual filing was made only one day beyond the statutory deadline of December 30th, and (2) whether the Act's notice provisions were inadequate, thereby resulting in a deprivation of a property interest without due process. The Court upheld both the Secretary's interpretation of the statute to require forfeiture upon late filings, id. 105 S.Ct. at 1791-94, and the Act's constitutionality with regard to notice. Id. at 1799-1801.
 
 
 29
 Locke did not directly address the issue before us: whether the Secretary's interpretation of section 314(a) to require the filing of annual reports beginning in the year following any initial recordation of a claim, even during the three year grace period, is reasonable. Nevertheless, the Court did undertake to interpret section 314(a) generally, and its discussion as to whether the Act provides adequate notice prior to forfeiture of a claim necessarily required the Court to explicate the mechanics of that section.
 
 
 30
 The Court's statement of the facts, describing the section's operation, is consistent with the Secretary's interpretation:
 
 
 31
 First, the claims must initially be registered with the BLM by filing, within three years of [the Act's] enactment, a ... notice or certificate of location.
 
 
 32
 Second, in the year of the initial recording, and "prior to December 31" of every year after that, the claimant must file ... a notice of intention to hold the claim [or] an affidavit of assessment work performed on the claim.... [F]ailure to comply with either of these requirements [will result in forfeiture under section 314(c) ].
 
 
 33
 105 S.Ct. at 1789 (emphasis added) (citations omitted). The Court characterized the Act as a forfeiture statute, see id. at 1794-96, that is sufficiently clear as to bar judicial "attempt[s] to soften the clear import of Congress' chosen words whenever a court believes those words lead to a harsh result." Id. at 1793. The Court pointed out that the Act serves two distinct purposes: (1) removal of stale claims, which is implemented by the initial recording requirement, and (2) establishment of a self-executing recording system to provide a continuing inventory of claims, which is implemented by the annual filing requirement. Id. at 1795, 1798. The Court held that there was no basis for any distinction with regard to the applicability of the forfeiture provision between failures to comply with either the initial or the annual filing requirements. Id. at 1795. As a result, strict compliance with the annual reporting deadlines was mandated, rather than merely "substantial compliance." Id. at 1796.
 
 
 34
 Addressing the issue of adequate notice, the Court discussed the three year grace period by observing that claimants "were not required to make an initial recording until October 1979." Id. at 1800. This period was held sufficient to pass constitutional muster with regard to the requirement to file an initial claim. Id. The Court's discussion of the annual filing requirement which follows sheds light on AMC's claim:
 
 
 35
 Moreover, the specific annual filing obligation at issue in this case is not triggered until the year after which the claim is recorded initially; thus, every claimant ... already has filed once before the annual filing obligations become due. That these claimants already have made one filing under the Act indicates that they know, or must be presumed to know, of the existence of the Act and of their need to inquire into its demands.
 
 
 36
 Id. (emphasis added) (footnote omitted).
 
 
 37
 We requested that the parties file supplemental briefs with regard to Locke' § impact on this case. NL apparently considers Locke' § discussion as dictum with regard to this appeal because different facts were involved. Nevertheless, NL does concede that the Court undertook to interpret section 314(a). NL continues to argue that the statute did not provide adequate notice to permit forfeiture on the facts of this case, and that the Secretary's construction of the Act does not merely choose between one of two reasonable alternatives but rather imposes an additional requirement beyond the statute's clear language. NL also relies on Justice Stevens's dissent in Locke as further evidence that no annual filings were required until after the three year grace period ending in 1979. In that dissent, Justice Stevens states that "1980 was generally the first year that claimants ... had to comply with the annual filing requirements." 105 S.Ct. at 1810 (Stevens, J., dissenting) (emphasis added). Moreover, NL continues to assert that there was an absence of clarifying regulations prior to 1979.
 
 
 38
 The Court's discussion in Locke of section 314(a)'s mechanics in its due process analysis necessarily required an interpretation of when annual filings were required. In that discussion, the Court clearly indicates that the annual filing requirement is "triggered" by the initial filing of a claim, and that the grace period relates solely to the initial filing. See 105 S.Ct. at 1800. Once a claimant files an initial claim, he is put on notice that more is required of him thereafter. The Court observed that this annual requirement imposes only "the most minimal of burdens on claimants" who have a "powerful motivation to comply" with the Act. Id. at 1798-99.
 
 
 39
 We disagree with NL's assertion that the Secretary has imposed an "extra requirement" beyond the statute's provisions. Rather, the Secretary interpreted a somewhat ambiguous statute, and provided regulations that are not ambiguous as to the requirements to file annual reports after the initial recording of a claim. See 43 C.F.R. Sec. 3833.2-1(a)(1) (1977).
 
 
 40
 The district judge observed that more than one reasonable interpretation of section 314(a) was possible, but that his own interpretation was the "most reasonable" one. Because the proper standard of review is whether the Secretary's interpretation is "arbitrary and capricious," however, the district judge is not free to substitute his own interpretation, even if more reasonable. We find it difficult to consider the Secretary's interpretation "unreasonable" when the Supreme Court, even if only in dictum, interpreted the statute in the same way.
 
 
 41
 The facts of this case suggest that NL's claim that the statute provides insufficient notice is not as strong as NL implies. Here, NL certainly was aware that it should file the annual reports, because it did file such a report in the year of its initial filing of a claim; the difficulty is that it failed to file another annual report the next year. NL originally argued that it had in fact made proper filings in 1978, but it failed to present evidence to support this claim. Thus, NL's own actions belie its claim that it was unaware of what the statute required.
 
 
 42
 In light of the deferential standard we must apply when reviewing the Secretary's interpretation of a statute which it is required to enforce, see Locke, 105 S.Ct. at 1793, and the Supreme Court's interpretation in Locke that closely parallels the Secretary's interpretation, we cannot say that the Secretary's action was arbitrary and capricious. We therefore must reverse the district court and reinstate the Bureau's decision.
 
 
 43
 REVERSED AND REMANDED with direction to affirm the Board's opinion and order the Secretary to reinstate the Bureau's decision.
 
 STEPHENS, District Judge, concurring:
 
 44
 In Locke, the Supreme Court identified two distinct Congressional purposes in adopting section 314(a), 43 U.S.C. Section 1744(a): (1) removal of state claims, (2) establishment of a self-executing recording system to provide a continuing inventory of claims, which is implemented by the normal filing requirement. When the language of the section is read in context with the purpose of the section, any ambiguity which might arguably exist when the language is considered in the abstract yields to a common sense understanding of the provision. In order to achieve an up to date inventory of claims existing at the end of each calendar year it is necessary to know what claims have been abandoned as well as what claims are initially registered. Claims registered soon after the commencement of the three year grace period are subject to abandonment at any time. A continuing inventory of registered claims commencing with October 21, 1976 is only achievable if each year after the initial registration the claimant files notice of intention to hold the claim. Absent such a notice, the claim is abandoned. A statistical base is consequently accumulated and of limited use during the grace period and complete by the end of the year 1979.
 
 
 
 *
 Honorable Albert Lee Stephens, Jr., United States District Judge, Central District of California, sitting by designation