PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

THE FRIENDS FOR FERRELL PARKWAY,
LLC; C. RANDOLPH ZEHMER; ANDREA
M. KILMER; MARIO A. ROSALES, JR.;
JACK R. DAVEY,
            *Plaintiffs-Appellants,*

            v.

JOHN P. STASKO, Refuge Manager,
Back Bay National Wildlife Refuge,
United States Fish and Wildlife
Service, Department of the Interior,
in his official capacity; ANTHONY D.
LEGER, Refuge Chief, National
Wildlife System, United States Fish
and Wildlife Service, Department of
the Interior, in his official capacity,
            *Defendants-Appellees.*

No. 01-1899

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Robert G. Doumar, Senior District Judge.
(CA-01-145-2)

Argued: January 22, 2002

Decided: February 28, 2002

Before WILKINSON, Chief Judge, and MOTZ and
GREGORY, Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Motz and Judge Gregory joined.

**COUNSEL**

**ARGUED:** Carl Strass, Virginia Beach, Virginia, for Appellants. Kent Pendleton Porter, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, Norfolk, Virginia, for Appellees. **ON BRIEF:** Kenneth E. Melson, United States Attorney, UNITED STATES ATTORNEY'S OFFICE, Norfolk, Virginia, for Appellees.

---

**OPINION**

WILKINSON, Chief Judge:

Plaintiffs filed suit against John Stasko and Anthony Leger, in their capacities as officials of the United States Fish and Wildlife Service ("FWS"). They sought judicial review of FWS' actions in connection with a proposed land transaction between FWS, the City of Virginia Beach, Virginia, and Lotus Creek Associates, L.P., a private developer. FWS wanted to acquire the lands in order to protect sensitive wetlands and wildlife habitat.

The district court dismissed the case for lack of Article III standing. Because none of the plaintiffs have constitutional standing to bring this suit against FWS, we affirm the judgment of the district court.

I.

The Friends for Ferrell Parkway, LLC, C. Randolph Zehmer, a resident of Sandbridge, Virginia, Andrea Kilmer, a resident of Lago Mar, Virginia, Mario Rosales, Jr., a resident of Red Mill Farm, Virginia, and Jack Davey, a resident of Lotus Creek, Virginia (collectively "plaintiffs"), filed suit against John Stasko and Anthony Leger of FWS. Stasko is Refuge Manager of the Back Bay National Wildlife Refuge, and Leger is Refuge Chief of the National Wildlife System. Plaintiffs sought to enjoin a proposed land transaction between FWS, the City of Virginia Beach, Virginia ("the City"), and Lotus Creek Associates, L.P., a private developer ("Lotus"). Plaintiffs' complaint focused on FWS' anticipated acquisition of two pieces of property. The first was a right of way owned by the City known as Ferrell VII.

The right of way was previously designated for construction of Ferrell Parkway, a road that would bypass certain subdivisions and present straighter access to Sandbridge, a resort area on the ocean. The second was a piece of property owned by Lotus known as Phases II and III of Lotus Creek, located adjacent to the Back Bay National Wildlife Refuge ("Refuge") and south of Ferrell VII.

Under the terms of the land transaction, FWS agreed to buy Phases II and III of Lotus Creek from Lotus for inclusion in the Refuge in exchange for the City's agreeing to sell FWS the Ferrell VII right of way. The City Council deemed preserving both parcels to be a necessary environmental protection measure, and abandoned proposed plans both to construct Ferrell Parkway and to allow development of Lotus Creek. In particular, the City Council concluded that the protection of both parcels in a natural state was necessary to "help mitigate natural and human threats to the Black Gut Natural Heritage Area and its respective habitats, thereby reducing natural habitat destruction and loss," and to "help reduce nonpoint source pollution loadings to the Back Bay watershed." In addition, the City and FWS agreed that the City would acquire FWS' lands bordering Sandbridge Road for the purpose of future road improvements by the City.

Plaintiffs' complaint alleged that FWS' proposed acquisition of Ferrell VII harmed them by not providing the benefits that the construction of Ferrell Parkway would purportedly generate. These benefits included providing Sandbridge residents with an emergency exit, and providing residents of Lago Mar, Red Mill Farm, and Lotus Creek with a route for through traffic to and from Sandbridge. Such a route would allegedly prevent traffic from flowing through their residential streets.

Plaintiffs sought judicial review under the Administrative Procedure Act, 5 U.S.C. § 702 *et seq.* They asserted that FWS was acting in violation of a variety of federal statutes and regulations, including the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, in seeking to acquire the Ferrell VII right of way. Plaintiffs sought to enjoin on a preliminary and permanent basis the proposed land acquisition.

Plaintiffs' amended complaint alleged that the sale of Phases II and III of Lotus Creek to FWS would injure plaintiff Davey because the

loss of that portion of Lotus Creek would make it impossible for the Lotus Creek condominium community to function as intended. Plaintiffs further amended their complaint to allege that Phases II and III lied outside the acquisition boundaries of the wildlife Refuge, and that FWS' actions in acquiring Lotus Creek constituted impermissible local land use planning.

On May 14, 2001, the district court dismissed plaintiffs' case for want of standing. Applying the standing requirements of *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), the court found that plaintiffs' purported injuries were "merely conjectural and hypothetical" for many reasons. First, access to Sandbridge Beach via Sandbridge Road continued to exist. Further, plaintiffs were not prohibited from obtaining better access to Sandbridge Beach, for the City planned to improve Sandbridge Road with land gained from the transaction with FWS. In addition, roads through a nearby military installation were opened in an emergency to provide access. Moreover, plaintiffs had no right under Virginia law to have a roadway constructed. *See* Va. Code Ann. § 15.2-2001 (Michie 1997 & Supp. 2000). And finally, plaintiffs' traffic flow concerns were highly speculative because there was no guarantee the City would build Ferrell Parkway even if it decided not to sell Ferrell VII.

The court next turned to plaintiff Davey's claim that he was injured because his opportunity to see Lotus Creek developed would be destroyed if the transaction were completed. The court thought it significant that there would then be no future residents of Phases II and III with whom he could share the costs of providing services to his community. But it held that he could not establish causation or redressability because Lotus — not FWS — caused his injury by deciding to sell the land. Thus, no relief granted against FWS would guarantee that the property would be developed. Plaintiffs appeal.

## II.

Article III, Section 2 of the Constitution restricts the federal courts to deciding actual cases and controversies. Among "[t]he several doctrines that have grown up to elaborate that requirement," the one "that requires a litigant to have 'standing' to invoke the power of a federal court is perhaps the most important." *Allen v. Wright*, 468 U.S. 737,

750 (1984). The basic purpose of standing doctrine is to ensure that the plaintiff has a sufficient personal stake in the outcome of a dispute to render judicial resolution of it appropriate in a society that takes seriously both "the idea of separation of powers" and, more fundamentally, the system of democratic self-government that such separation serves. *Id.* at 750-52. The doctrine encompasses both prudential, "judicially self-imposed limits on the exercise of federal jurisdiction," and "a core component derived directly from the Constitution." *Id.* at 751; *see also Defenders of Wildlife*, 504 U.S. at 560.

In order to satisfy Article III's standing requirements, the plaintiff must show that: (1) he has suffered an injury in fact; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *see also Defenders of Wildlife*, 504 U.S. at 560-61; *Allen*, 468 U.S. at 751. The plaintiff bears the burden of establishing injury, traceability, and redressability because it is the party seeking to invoke federal jurisdiction. *Defenders of Wildlife*, 504 U.S. at 561; *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990).

In addition, an association has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor the relief requested requires the participation of individual members in the suit. *Laidlaw*, 528 U.S. at 181; *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Only the first prong of associational standing is in contention here insofar as plaintiff the Friends for Ferrell Parkway is concerned.

As we have previously recognized, the injury-in-fact element requires that the plaintiff "suffer an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000) (en banc) (citing *Defenders of Wildlife*, 504 U.S. at 560). The alleged injury must not be "conjectural or hypothetical." *Laidlaw*, 528 U.S. at 180; *Defenders of Wildlife*, 504 U.S. at 560 (internal quotations omitted). The traceability

requirement ensures that it is likely the plaintiff's injury was caused by the challenged conduct of the defendant, and not by the independent actions of third parties not before the court. *Gaston Copper*, 204 F.3d at 154 (citing *Defenders of Wildlife*, 504 U.S. at 560). And the redressability prong requires that it be likely, and not merely speculative, that a favorable decision from the court will remedy the plaintiff's injury. *Id.* (citing *Defenders of Wildlife*, 504 U.S. at 561).

Although each of these three requirements of standing are analytically distinct and must be treated as such, "their proof often overlaps." *Gaston Copper*, 204 F.3d at 154. And as we will now show, so too can their absence of proof.

## III.

## A.

In contending that they meet the injury-in-fact requirement, plaintiffs initially describe their alleged injuries as follows in their brief before this court:

> FWS' acquisition of Ferrell 7 will commit the plaintiffs to a diminished quality of life, with more noise, traffic, auto noise and fumes. They will have less emergency access, both in and out, and worsened opportunity to visit friends and other parts of Virginia Beach. Local streets will be less safe. Even if the Friends For Ferrell have no property interest of any kind in Ferrell 7, or in the completion of Lotus Creek as originally envisioned, they have a liberty interest in access to their community, and in continuation of their community, which cannot be destroyed without due process.

Here, plaintiffs characterize their purported injuries as residing in the deleterious effects they believe FWS' acquisition of Ferrell VII will impart through precluding construction of Ferrell Parkway.

And yet immediately following this description of their claimed injuries, plaintiffs recharacterize them as follows:

> To put it another way, before the Transaction the Friends For Ferrell had the opportunity to lobby for construction of Ferrell 7, a needed roadway with much long time and current support. The Friends For Ferrell also had the opportunity to see Lotus Creek developed as planned. Before FWS' actions, Lotus Creek was planned to be a condominium community with private amenities. FWS illegally seeks to eliminate those opportunities and reduce Lotus Creek to a small number of homes with limited opportunities.

Here, plaintiffs do not "put it another way." Rather, they reconceptualize their stated injuries from the effects of the absence of development to the loss of their opportunity to prevent those effects. This is a significant move, for a "central problem" in standing doctrine "is how to characterize the relevant injury." Cass R. Sunstein, *Standing and the Privatization of Public Law*, 88 Colum. L. Rev. 1432, 1464 (1988); *see also* Richard H. Fallon *et al.*, *Hart and Wechsler's The Federal Courts and The Federal System* 148-49, 172 (4th ed. 1996). Reformulating the proffered injury as a lost opportunity can have significant consequences for the entire standing inquiry. *See* Sunstein, *supra*, at 1463-66 (discussing the effect on the causation and redressability analyses of recharacterizing the injury as the deprivation of an opportunity); Fallon *et al.*, *supra*, at 148-49, 172 (same). In this case, however, it ultimately makes no difference how plaintiffs conceptualize their alleged injuries, as we demonstrate by applying standing doctrine to each characterization in turn.

B.

1.

To begin with, it is not at all clear that what plaintiffs call their "liberty interest in access to their community, and in continuation of their community" is "a legally protected interest." *Defenders of Wildlife*, 504 U.S. at 560. As the district court found, the proposed sale of Ferrell VII by the City to FWS impacts none of plaintiffs' rights because under Virginia law they have no entitlement to the construction of a roadway. Rather, the City has plenary power to determine how its roadways will be planned and constructed. *See* Va. Code Ann. § 15.2-2001.

But even assuming that a legally cognizable injury is implicated in this case, the effects plaintiffs posit that FWS' purchase of Ferrell VII would have on that interest are wholly speculative. As the district court observed, plaintiffs are not deprived of access to Sandbridge Beach by the purchase because access via Sandbridge Road continues to exist. In addition, plaintiffs are not prohibited from obtaining improved access to Sandbridge Beach. Indeed, the City contemplates making improvements to Sandbridge Road with property it would gain through the proposed land transaction with FWS. Further, emergency access to and from Sandbridge Beach is not prevented via Sandbridge Road, and roadways through the military installation next to Sandbridge are opened in an emergency. Moreover, plaintiffs may request that the City take action to address traffic concerns in their neighborhoods.

Finally, the allegations of increased traffic flow, auto noise and auto fume problems due to the City's failure to build the parkway are highly speculative because there is no reason to have any confidence that the City would build Ferrell Parkway if it decided not to sell Ferrell VII to FWS. Kilmer, the only plaintiff to testify concerning the construction of Ferrell Parkway, conceded that there had been no funding earmarked for its construction since 1995, and that the City had abandoned plans to construct it. Kilmer stated only that she "hoped" the parkway would be constructed some day while she still lived in a nearby neighborhood. Indeed, she was not sure when the preceding phase of the parkway was going to be built. She also agreed with the district court that she lived "pretty far away" from the neighborhood traffic problems about which plaintiffs complain. She further acknowledged that the "major impact" on her from future traffic problems in her neighborhood was a proposed new development nearby. Moreover, she did not anticipate that those problems would materialize for two-to-three years, and she admitted that it could take significantly longer. Finally, she confessed that the present traffic conditions on the road that she believed would become problematic for her were "currently minimal."

Under these circumstances, plaintiffs cannot satisfy the requirement that the injury in fact be "actual or imminent, not conjectural or hypothetical." *Laidlaw*, 528 U.S. at 180; *Defenders of Wildlife*, 504 U.S. at 560 (internal quotations omitted). The purpose of the immi-

nence requirement is "to ensure that the alleged injury is not too speculative for Article III purposes." *Defenders of Wildlife*, 504 U.S. at 564-65 n.2. It is pure conjecture to believe that, absent the sale of Ferrell VII to FWS, Ferrell Parkway would be built anytime in the near future. As the Supreme Court has held, "[s]uch 'some day' intentions — without any description of concrete plans, or indeed even any specification of *when* the some day will be — do not support a finding of the 'actual or imminent' injury" required to establish standing. *Id.* at 564. The injury-in-fact prong of the standing inquiry cannot be met by citizens hypothesizing about the speculative effects of an absence of development.

Plaintiff Davey's allegation that he would be injured by FWS' possible acquisition of Phases II and III of Lotus Creek presents a somewhat closer case. He claims that if the proposed transaction were completed, he would be unable to share the costs of providing services and private amenities to his community with future residents of Phases II and III. According to Davey, Lotus had told him at the time he purchased his lot in Phase I that he would be able to share these costs with all future residents of Phases I, II, and III. Now that Lotus intends to sell Phases II and III to FWS, only the forty-five houses in Phase I that have been platted and recorded in the deed books can be constructed in Lotus Creek. Thus, Davey can share costs with only the current and future residents of those houses. It was in view of these considerations that the district court found him to have an interest in having others share the costs of providing services and amenities to Lotus Creek.

However, FWS points out that Lotus Creek has never been formally approved for development beyond forty-five home sites, and that Phases II and III are wholly undeveloped land. In addition, Davey admitted almost two years after he bought his property that only one additional house had been built to supplement the six that were there when he arrived in 1999.

The district court confirmed that there have been no improvements on any portion of Lotus Creek except for the forty-five lots in Phase I, and that only those lots have been legally platted or subdivided. In addition, the court found that, prior to the recordation of a subdivision plat, City and State ordinances require that either the improvements

be completed and accepted by the City and State, or an appropriate bond be posted to assure completion of the improvements in accordance with municipal and State standards. The court observed that Lotus may never actually construct the utilities and streets. It further noted that the City and State may refuse to accept and certify the improvements. Phases II and III of Lotus Creek could not then be subdivided or sold as individual lots unless a performance bond acceptable to the City and State were filed.

Substantial evidence in the record causes us to question whether the City would grant its approval to the development of Phases II and III. Indeed, before FWS offered to buy that land from Lotus, the City Council determined in response to citizen concerns that it would be in the best interests of the City if Lotus Creek were purchased in order to prevent its development. The City subsequently stated that "the development of the Lotus Creek Property would be detrimental to the public interest, and that the Property, in its entirety, should be maintained in its present natural state."

As it is pure conjecture to believe that, absent the sale of Ferrell VII to FWS, Ferrell Parkway would be built anytime in the near future, so it requires numerous, questionable assumptions to conclude that Phases II and III of Lotus Creek would be developed even in the absence of FWS' purchase of that land. Even if plaintiffs could somehow show injury in fact, however, they cannot meet the traceability and redressability requirements of the standing inquiry, which we next consider.[1]

2.

The failure to build Ferrell Parkway is not "fairly traceable" to FWS. *Laidlaw*, 528 U.S. at 180 (citing *Defenders of Wildlife*, 504 U.S. at 560-61). The City independently chose to sell the land to FWS instead of building the road in order to protect the environment. It is thus not "likely" that a favorable court decision would result in its being built. *Id.* at 181.

---

[1]We analyze the traceability and redressability prongs in the same section because they rise or fall together in this case.

In addition, plaintiffs' alleged injuries (i.e., traffic, noise, fumes, and diminished access) are not "fairly traceable" to FWS. Rather, they are caused by the increased traffic that inevitably accompanies the continued construction of residential communities and shopping centers in the area. Thus, it is not "likely" that a favorable court decision would eliminate the harms about which plaintiffs complain even if the road were built. *Id.*

Similarly, the district court correctly determined that Davey's injury was not caused by FWS, but rather by Lotus. It was Lotus, after all, that independently decided to sell Phases II and III of Lotus Creek to FWS instead of developing the property. And it was Lotus which had allegedly promised Davey that the land would be developed. In addition, it is the City that must approve any future development of Lotus Creek. As a result, no relief granted against FWS would in any way render it "likely" that the property would be developed. *Id.*

It is true that the "fairly traceable" standard is "not equivalent to a requirement of tort causation." *Natural Res. Def. Council, Inc. v. Watkins*, 954 F.2d 974, 980 n.7 (4th Cir. 1992) (quoting *Pub. Interest Research Group, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir. 1990)); *see also Gaston Copper*, 204 F.3d at 161. But we do not insist on anything resembling such a strict standard of causation in finding that plaintiffs' claimed injuries are not fairly traceable to FWS with respect to either Ferrell VII or Phases II and III of Lotus Creek. Indeed, the "fairly traceable" requirement "is in large part designed to ensure that the injury complained of is 'not the result of the independent action of some third party not before the court.'" *Gaston Copper*, 204 F.3d at 162 (quoting *Defenders of Wildlife*, 504 U.S. at 560). That is exactly the situation in the case at bar. Here, "[t]he existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Defenders of Wildlife*, 504 U.S. at 562 (internal quotation omitted). Under these circumstances, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* Plaintiffs have not made that showing.

## C.

We turn now to plaintiffs' alternative conceptualization of their injuries as the destruction of their opportunities to lobby for construction of Ferrell Parkway and to see Lotus Creek developed as planned. Describing their injuries at this greater level of generality does little to satisfy standing requirements, because plaintiffs' opportunities were so problematic to begin with. For example, plaintiffs cannot sidestep the requirements for standing by recharacterizing a wholly speculative injury as a diminished opportunity to prevent that injury when the facts reveal the "opportunity" itself to be just as tenuous.

To reiterate, the City Council views the preservation of Ferrell VII and Phases II and III of Lotus Creek to be necessary environmental protection measures. As a consequence, it has not taken any financial steps to lay the groundwork for construction of Ferrell Parkway since 1995, and it has abandoned the proposed plans to allow the development of Lotus Creek. Plaintiffs have been objecting to these decisions, apparently quite passionately, for some time now. But they have not been able to persuade the City to change course.

In view of these telling facts, we fail to perceive a legally protected interest that is "concrete." *Defenders of Wildlife*, 504 U.S. at 560. Plaintiffs are certainly correct that a litigant may be injured in fact by the threatened destruction of an opportunity. *See, e.g.*, Fallon *et al.*, *supra*, at 148 (discussing five Justices' characterization of plaintiff's injury in *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 280-81 n.14 (1978) (opinion of Powell, J.), as the deprivation of the chance to compete for every place in the entering medical school class simply because of his race); *see also* Sunstein, *supra*, at 1465 (discussing *Bakke*, as well as the *Allen* plaintiffs' characterization of their injury as "the deprivation of an opportunity to undergo desegregation in school systems unaffected by unlawful tax deductions"); *Allen*, 468 U.S. at 756 (validating as judicially cognizable plaintiffs' identification of their injury as "their children's diminished ability to receive an education in a racially integrated school"). But this does not mean that the threatened loss of any opportunity, no matter how abstract and speculative, will do. One cannot complain about having an opportunity taken away when one does not have a real, concrete opportunity in the first place. To hold otherwise would transform standing

doctrine and threaten the core democratic values that it serves. *See, e.g.*, *Allen*, 468 U.S. at 750-52.

Indeed, our acceptance of plaintiffs' contention that the mere threatened loss of a remote opportunity is sufficient to confer standing would quickly lead to absurd consequences. A child would then be injured in fact by the prospect of NASA's shutting down its space program because she would no longer have the chance to become an astronaut. Though we do not question the sincerity of plaintiffs' pleas, we decline to launch standing doctrine into outer space.

Plaintiffs rely upon *Bryant v. Yellen*, 447 U.S. 352 (1980), for the proposition that the threatened opportunity which serves as the basis for standing can be "fairly remote." In point of fact, however, the Supreme Court in that case held that the respondents had standing because it was "likely" that a favorable decision would allow them to realize the opportunity they sought (namely, purchasing lands at prices below the market value for irrigated land), even though they could not "with certainty" establish that those lands would become available for them to purchase at less than market prices as a result of a decision in their favor. *Id.* at 366-68. Here, plaintiffs cannot demonstrate a likelihood of realizing their threatened "opportunities" in the absence of the alleged threat. Indeed, they do not even claim that it is likely Ferrell Parkway will be built if FWS does not acquire Ferrell VII from the City, or that Phases II and III of Lotus Creek will be developed if FWS does not acquire that land from Lotus. And as discussed above, both the City and Lotus have independently disclaimed any intention of developing either piece of property.

### IV.

It seems appropriate to step back and take stock of just how different this case is from decisions such as *Laidlaw* and *Gaston Copper*. There the plaintiffs were held to have standing on the ground that they had reasonable concerns about the actual or threatened effects of defendants' discharges of pollutants on their recreational, aesthetic, and/or economic interests. *See Laidlaw*, 528 U.S. at 181-85; *Gaston Copper*, 204 F.3d at 156-63. Unlike those decisions, in which the plaintiffs sought standing to challenge the visitation of environmental harms, the case at bar presents the opposite scenario. Here, plaintiffs

seek standing to contest state action intended to protect the environment, ironically in the name of environmental enactments. Rather than being faced with actual or threatened environmental harms that constitute a deviation from the status quo *ex ante*, plaintiffs in this case are challenging the City's maintenance of the status quo by leaving the land in its natural state.

But the visitation of environmental harms through disturbance of the status quo is different from the speculative effects of preservation of the status quo through the absence of development. To recognize the speculative effects of a lack of development broadly, and to rely upon federal environmental protection statutes such as NEPA in doing so, would be to turn those statutes on their head. Plaintiffs urge upon us a view of injury in the environmental context that would wholly thwart the will of Congress. It is therefore unsurprising that Article III standing doctrine preserves the separation of powers by preventing plaintiffs from moving forward in federal court.

V.

Plaintiffs may have a cause of action against the City Council for violating state law in attempting to sell Ferrell VII.[2] In addition, perhaps plaintiff Davey may be able to obtain relief by filing suit against Lotus for breach of contract. Further, plaintiffs can certainly seek the political remedy of convincing the City Council that further development of Virginia Beach and improved roadways would be worthwhile. Regardless of the viability of these avenues of redress,

---

[2]Indeed, the Circuit Court for the City of Virginia Beach enjoined the City from selling the City land involved in the transaction on the ground that the ordinances authorizing the sale were invalid under state law because they were not approved by three-fourths of the City Council. *See Andrea Kilmer, and Friends of Ferrell Parkway, L.L.C. v. The City of Virginia Beach*, No. CH01-1486 (order entered June 6, 2001). The City is appealing, and in the interim it has embarked upon an effort to carry out the proposed land transaction with FWS by substituting a lease of Ferrell VII for 40 years. A condition of the lease is that the uses of the land be the same as if the sale had been accomplished. Thus, even if the state court judgment is affirmed on appeal, it still will not render the case at bar moot.

however, one thing is clear: where ever else plaintiffs' grievance lies, it does not lie in this court. Plaintiffs are attempting to turn what is a state law case into a federal cause of action. And at the same time, they are attempting to transmute what is in large measure a question of local democratic politics into a suit in federal court. Plaintiffs object to the balance the City is currently striking between attending to its traffic flow and safety problems on the one hand and addressing its environmental concerns on the other. But this is the chance we all take living in a democracy. Disagreement with political outcomes, even emphatic disagreement, does not by itself confer a federal cause of action.

## VI.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.